914 So.2d 533 (2005)
MALLARD BAY DRILLING, INC.
v.
John Neely KENNEDY, Secretary of Department of Revenue, State of Louisiana.
No. 2004-C-1089.
Supreme Court of Louisiana.
June 29, 2005.
Rehearing Denied November 29, 2005.
*536 Charles C. Foti, Jr., Attorney General, Geneva Landrum, Assistant Attorney General, Frederick Mulhearn, Assistant Attorney General, Emily W. Toler, Assistant Attorney General, Alva Smith, Assistant Attorney General, Counsel for Applicant.
Stephen Hawley Myers, LLC, Stephen H. Myers, Lafayette, LA, Richard H. Morgan, Counsel for Respondent.
Andrew A. Lemmon, Hahnville, LA, Counsel for St. Charles Parish School Board (Amicus Curiae).
Patrick Michael Amedee, Metairie, LA, Counsel for Lafourche Parish School Board (Amicus Curiae).
Robert R. Rainer, Baton Rouge, LA, Counsel for Iberia Parish School Board through Sales and Use Tax Department, Lafayette Parish School Board through Sales Tax Division, Pointe Coupee Parish *537 Police Jury through Sales and Tax Department, St. Mary Parish Council through Sales and Use Tax Department, and West Baton Rouge Parish Revenue Department (Amicus Curiae).
KIMBALL, Justice.
This case involves the procedural issue of whether the legislature's enactment of Act No. 40 of 2002, which amended La. R.S. 47:305.1 and purported to explain and clarify its original intent notwithstanding this court's contrary interpretation in Archer Daniels Midland Co. v. Parish School Bd. of Parish of St. Charles, 01-0511 (La.11/28/01), 802 So.2d 1270, can be applied retroactively. Finding that retroactive application of the Act is in violation of the principles of separation of power, we hold that the Act can be applied prospectively only. This case also involves issues relating to the imposition of sales taxes on diesel fuel sold, delivered, and consumed in Louisiana by drilling barges in the course of their offshore drilling activities. For the reasons that follow, we conclude that the taxpayer is not entitled to the sales tax exemption provided by La. R.S. 47:305.1(B), which provides a tax exemption under certain circumstances to owners or operators of ships or vessels operating exclusively in foreign or interstate coast-wise commerce, because it is not the owner or operator of a "ship or vessel." Furthermore, we conclude the imposition of the taxes at issue is not prohibited by La. R.S. 47:305(E) because the sales taxes were levied on fuel consumed in the state. Finally, we conclude that the imposition of the sales taxes does not unconstitutionally burden the Commerce Clause of the U.S. Constitution.

Facts and Procedural History
Mallard Bay Drilling, Inc. (hereinafter "Mallard") is engaged in the business of drilling oil and gas wells along the Gulf Coast. Essentially, Mallard has drilling barges[1] for hire wherever the job is to be performed. Mallard's barges stay at the drilling location until a platform and production equipment can be set in place. The barges do not power themselves from place to place, but instead are towed and put in place by tugboats.
In the course of its business operations from January 1, 1993, through December 31, 1995, Mallard purchased diesel fuel to power its drilling barges while they were employed in drilling operations. This diesel fuel was purchased by Mallard, delivered to the drilling location by barge, off-loaded onto Mallard's drilling barge, and consumed there in the process of its drilling operations. Mallard was charged, and subsequently paid, sales taxes on its purchases of this diesel fuel.
In June 1996, Mallard filed a Claim for Refund of Taxes Paid with the Sales Tax Division of the Department of Revenue (hereinafter "DOR") in which it requested a refund in the amount of $238,442.08 for the tax period January 1, 1993, through December 31, 1995. Mallard stated the following reason for the claim: "Tax paid on purchases of diesel fuel used for production of motive power on Mallard Bay Drilling's drilling barges as per attached schedules." After reviewing the refund claim, the DOR denied Mallard's request, concluding that "the diesel fuel used was for vessels that were operated in state waters."
Subsequently, Mallard filed with the Board of Tax Appeals (hereinafter "the *538 Board") a Petition for Redetermination of Sales and Use Tax Assessment protesting the denial of its refund claim. In its petition, Mallard asserted it was entitled to the exemption from sales and use taxes provided in La. R.S. 47:305.1(B), which grants an exemption from certain taxes levied on materials and supplies purchased by the owners or operators of ships or vessels operating exclusively in foreign or interstate coastwise commerce, where such materials and supplies are loaded upon the ship or vessel for use or consumption in the maintenance and operations thereof. A hearing was held before the Board on November 14, 2000, after which the Board denied Mallard's request for a refund, stating in part:
The factual situation as the Board has determined, after listening to the evidence, is that we have diesel fuel that was delivered in the State of Louisiana to the taxpayer's drilling barges, drilling rigs. The Board finds that it was not only delivered in Louisiana, it was consumed in Louisiana and was a Louisiana sale.
The Board also rejected Mallard's contention that the imposition of taxes would impermissibly burden interstate commerce, concluding that the drilling barges consumed the fuel when they were either in Louisiana or within the three-mile limit.
Following the Board's ruling, Mallard filed a petition to review the Board's decision in the district court. On August 26, 2003, the district court issued a judgment granting the refund requested by Mallard. In reaching its decision, the district court concluded that Mallard's intrastate activities qualified as interstate commerce, and the imposition of the tax would unduly burden interstate commerce. Accordingly, the district court awarded Mallard a refund in the amount of $238,442.08.
Subsequently, the DOR appealed, and the court of appeal affirmed the judgment of the district court. Mallard Bay Drilling, Inc. v. Kennedy, 03-1495 (La.App. 3 Cir. 3/31/04), 869 So.2d 954. The court of appeal reasoned that under the definition of "foreign or interstate coastwise commerce" provided by La. R.S. 47:305.1, as amended in 2002, Mallard's actions satisfied the requirements for the exemption, despite the fact that its barges did not always cross state borders. In explaining its conclusion, the court of appeal stated:
The actions taken by Mallard Bay are part of a stream of commerce terminating outside the borders of Louisiana. Mallard Bay's vessels are towed from place to place to drill for oil. The vessels also act as a temporary platform to secure the oil or gas produced once drilling operations are completed. Once the well site is secure, the vessels are moved off to a different location, with the oil shipped to refineries, primarily in Louisiana and Texas. Once refined, the oil and gas continues in interstate commerce to be consumed virtually anywhere. The flow of gas [oil] from the wellhead to the ultimate consumer is nothing other than interstate commerce.
Id., 03-1495 at p. 4, 869 So.2d at 957 (citation omitted). Based on this reasoning, the court of appeal found no error in the district court's opinion and, consequently, affirmed its judgment.
Upon the application of the DOR, this court issued an order granting certiorari to consider the correctness of the court of appeal's judgment. Mallard Bay Drilling, Inc. v. Kennedy, 04-1089 (La.9/3/04), 882 So.2d 544.

Discussion
Pursuant to statutory authority, the state imposes a tax upon the sale at retail, the use, the consumption, the distribution, *539 and the storage for use or consumption in this state, of each item or article of tangible personal property. La. R.S. 47:302(A). Diesel fuel is "tangible personal property" as defined by tax law. La. R.S. 47:301(16)(a). The legislature has provided several exclusions and exemptions from sales taxes that would otherwise be due under the law. At issue in this case is the exemption provided by La. R.S. 47:305.1(B). At the time Mallard purchased the diesel fuel at issue, La. R.S. 47:305.1(B) provided in pertinent part:
The taxes imposed by R.S. 47:302 and R.S. 47:321[[2]] shall not apply to materials and supplies purchased by the owners or operators of ships or vessels operating exclusively in foreign or interstate coastwise commerce, where such materials and supplies are loaded upon the ship or vessel for use or consumption in the maintenance and operation thereof.. . .
In November 2001, while the instant matter was pending in the district court, this court rendered an opinion in Archer Daniels Midland Co. v. Parish School Bd. of Parish of St. Charles, 01-0511 (La.11/28/01), 802 So.2d 1270, wherein we interpreted the phrase "exclusively in foreign or interstate coastwise commerce" as used in the exemption at issue. In that case, tugboat operators filed suit to recover parish sales taxes paid on fuel purchased and used to operate their tugboats. The tugboats were used to break up tows of river barges and to shift the barges to a fleeting area along the Mississippi River for safekeeping until the barges were ready to be unloaded. Once the barges were ready for unloading, the tugboats shifted the barge from the fleeting area to the unloading area. After the barges were unloaded, the tugboats again shifted the barges back to the fleeting area until they were picked up for transport back up river. The parties in the case stipulated that the tugboats never left the waters of St. Charles Parish while performing these fleeting and shifting services.
Because the parish ordinance granting the exemption at issue was modeled on La. R.S. 47:305.1(B) and incorporated the interpretation of the state sales tax exemption, this court was required to interpret La. R.S. 47:305.1(B) to decide the case. The tugboat operators argued that they were entitled to the exemption because their tugboats facilitated the movement of goods in interstate commerce and thereby operated "exclusively in foreign or interstate coastwise commerce" even though they never left Louisiana waters. After noting that all the other statutory requirements for the application of the exemption were satisfied and therefore the only issue to be decided was whether the tugboats operated "exclusively in foreign or interstate coastwise commerce," this court found that the focus of the analysis should be on the movement of the taxpayer's ships or vessels. We determined that for a taxpayer's ships or vessels to operate "exclusively in foreign or interstate coastwise commerce" within the meaning of La. R.S. 47:305.1(B), they must leave Louisiana waters. Accordingly, because the tugboats operated wholly within Louisiana waters, we concluded that the taxpayers were not entitled to the sales tax exemption.
In response to this decision, the legislature amended and reenacted La. R.S. 47:305.1(C) to define the term "foreign or interstate coastwise commerce." Acts 2002, No. 40.[3] Effective June 25, 2002, the amendment to subsection (C) provides:

*540 C. (1) For purposes of this Section, the term "foreign or interstate coastwise commerce" shall mean and include trade, traffic, transportation, or movement of passengers or property by, in, or on a ship or vessel:
(a) Between a point in one state and a point outside the territorial boundaries of such state;
(b) Between points in the same state where the trade, traffic, transportation, or movement of passengers or property traverses through a point outside of the territorial boundaries of such state;
(c) At a point in or between points in the same state as part of or in connection with the business of providing or delivering materials, equipment, fuel, supplies, crew, repair services, laundry services, dredging waterways services, stevedoring services, other loading or unloading services, or ship or vessel movement services to or for ships or vessels that are operating in foreign or interstate coastwise commerce as defined in this Subsection; or
(d) At a point in or between points in the same state when such trade, traffic, transportation, or movement of passengers or property is part of or consists of one or more segments of trade, traffic, transportation, or movement of passengers or property that either (i) follows movement of passengers or property into or within the state from a point beyond the territorial boundaries of such state, (ii) precedes movement of the passengers or property from within the state to a point outside the territorial boundaries of such state, or (iii) is part of a stream of trade, traffic, transportation, or movement of passengers or property originating or terminating outside the territorial boundaries of such state or otherwise in foreign or interstate coastwise commerce, as defined in this Subsection.
(2) The term "foreign or interstate coastwise commerce" shall not include intrastate commerce, which, for purposes of this Section, shall mean any trade, traffic, transportation, or movement of passengers or property in any state that is not described in the term "foreign or interstate coastwise commerce" as defined in this Section.
(3) For purposes of this Section, the term "component part" or "component parts" shall mean and include any item or article of tangible personal property that is:
(a) Incorporated into, attached to, or placed upon a ship, vessel, barge, commercial fishing vessel, drilling ship, or drilling barge (collectively referred to in this Section as "vessel" or "vessels") during either (i) the construction of such vessel in the case of the exemption provided in Subsection A of this Section, or (ii) the repair of such vessel in the case of the exemption provided for in Subsection B of this Section;
(b) Required for the navigation or intended commercial operation of a vessel; or
(c) Required to obtain certification or approvals from the United States Coast Guard or any regulatory agency or classification society with respect to a vessel.
(4) For purposes of this Section and except with respect to any gaming equipment, as defined in R.S. 27:44(12), the determination of whether any item or article of tangible personal property is a *541 component part shall be made without regard to any provision of the Louisiana Civil Code.
(5) The provisions of Paragraph (3) of this Subsection shall not apply to any gaming equipment as defined in R.S. 27:44(12).
Section 2 of the Act specifies the legislature's intent as follows:
The provisions of this Act are interpretative of R.S. 47:305.1 and are intended to explain and clarify its original intent, notwithstanding the contrary interpretation given in "Archer Daniels Midland Company v. The Parish School Board of the Parish of St. Charles", 01-C-0511 (La.11/28/01), 802 So.2d 1270, and all cases consistent therewith. Therefore, the provisions of this Act shall be applicable to all claims existing or actions pending on its effective date and to all claims arising or actions filed on and after its effective date.
In this court, the DOR argues that the legislature's attempt to retroactively apply the provisions of Act 40 to pending actions violates the concept of separation of powers. The DOR also contends that the retroactive application of the amendment violates various other constitutional provisions. Mallard responds that the DOR did not properly raise the issue of constitutionality, that the DOR, as a governmental entity, lacks standing to challenge the constitutionality of the Act, and that the constitutionality of the Act cannot be entertained absent notification of the Attorney General.
It is well-established that litigants must raise constitutional challenges in the trial court rather than in the appellate courts, and that the constitutional challenge must be specially pleaded and the grounds for the claim particularized. Unwired Telecom Corp. v. Parish of Calcasieu, 03-0732, p. 6 (La.1/19/05), 903 So.2d 392 (on rehearing); Vallo v. Gayle Oil Co., Inc., 94-1238, p. 8 (La.11/30/94), 646 So.2d 859, 864-65. An exception to these general principles exists when the statute applicable to the specific case becomes effective after the appeal is lodged in the higher court.[4]Mosing v. Domas, 02-0012, p. 11 n. 2 (La.10/15/02), 830 So.2d 967, 975 n. 2.
In the instant case, Act 40 became effective on June 25, 2002. Thus, the amendment did not exist during the pendency of the case before the Board.[5] The Act became effective after the district court held a hearing on the matter, but during the time the case was under advisement prior to the issuance of that court's judgment. Once the Act became effective, Mallard filed a Supplemental Post-Hearing Memorandum asserting the applicability of the Act. The record contains no pleading filed by the DOR contesting the constitutionality of the Act as applied to its case.[6] The *542 district court entertained the case under its appellate jurisdiction, which raises the issue of whether it could hear a constitutional challenge under such jurisdiction. Nevertheless, the record reveals no attempt on the part of the DOR to raise the issue of the Act's constitutionality in the case before the district court or to invoke the district court's original jurisdiction by filing an action for declaratory judgment. Although the district court clearly referenced the Act's amendment of La. R.S. 47:305.1 in a section of its reasons entitled "Applicable Law," the DOR failed to raise the constitutionality of the Act as applied in the court of appeal. Instead, it raised the issue for the first time in documents filed in this court.
Ordinarily, we might refuse to consider an assertion of unconstitutionality raised for the first time in this court, particularly in light of the fact that the DOR had ample opportunity to raise the issue in the courts below. However, in view of the particular factual situation involved in this case, and in conformity with the majority opinion in Unwired that judicial economy is best served by addressing the issue, we will address the constitutionality of applying the Act to the instant litigation. The fundamental purpose of procedural rules should be to fully secure the parties' substantive rights. Unwired, 03-0732 at p. 10, 903 So.2d at 401. The parties and various amici have thoroughly addressed the constitutional issues, and, while the DOR has failed to properly raise the constitutional issue, we are inclined to address the constitutionality of the Act as applied to this case. The DOR has a sufficiently real and actual interest to challenge the constitutionality of the Act that became effective during the pendency of litigation involving a taxpayer, and thus has standing to assert the claim. Additionally, the Attorney General is not an indispensable party to this particular litigation. See Vallo, 94-1238 at p. 7, 646 So.2d 859, 864 ("Irrespective of how the constitutionality of a statute is challenged, the attorney general is not an indispensable party. . . . When the constitutionality of a statute, ordinance or franchise is assailed in a declaratory judgment action the attorney general must be served with a copy of the proceeding and he is entitled to be heard and/or, at his discretion, to represent or supervise the representation of the interests of the state in the proceeding. . . . In all other proceedings in which the constitutionality of a statute, ordinance or franchise is assailed, the attorney general should be served notice and/or a copy of the pleading and, at his discretion, be allowed to be heard and to represent or supervise the representation of the interests of the state in the proceeding.").[7] Moreover, we note that while the retroactivity analysis necessarily has constitutional implications, it has always been the role of this court to determine the applicable law in any given case.
The powers of the state's government are divided into three separate branches: *543 legislative, executive, and judicial. La. Const. art. II, § 1. Unless authorized by the constitution, no one of the branches, or anyone holding office in one of them, shall exercise power belonging to either of the others. La. Const. art. II, § 2.
The legislative power of the state is vested in the legislature. La. Const. art. III, § 1. In exercising the legislative power of the state, the legislature may enact any legislation not prohibited by the constitution. Board of Comm'rs of Orleans Levee Dist. v. Department of Natural Resources, 496 So.2d 281, 286 (La.1986) (on rehearing). The legislature is free, within constitutional limits, to give its enactments retroactive effect. St. Paul Fire & Marine Ins. Co. v. Smith, 609 So.2d 809, 816 (La.1992).
Initially, when determining whether a statute should be given retroactive effect, a court must defer to the intent of the legislature. Bourgeois v. A.P. Green Indus., Inc., 00-1528, p. 6 (La.4/3/01), 783 So.2d 1251, 1257. Article 6 of the Civil Code, entitled "Retroactivity of laws," provides:
In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretative laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary.
Concomitantly, La. R.S. 1:2, which is construed as being co-extensive with La. C.C. art. 6, provides:
No Section of the Revised Statutes is retroactive unless it is expressly so stated.
This court has previously interpreted these provisions as necessitating a two-part inquiry:
First, we must ascertain whether in the enactment the legislature expressed its intent regarding retrospective or prospective application. If the legislature did so, our inquiry is at an end. If the legislature did not, we must classify the enactment as substantive, procedural or interpretive.
Unwired, 03-0732 at p. 15, 903 So.2d at 404 (quoting Cole v. Celotex Corp., 599 So.2d 1058, 1063 (La.1992)). However, even where the legislature has expressed its intent to give a law retroactive effect and has classified the law as interpretive, the legislation may not be applied retroactively if the legislative change violated the principles of separation of powers and independence of the judiciary. Id.
We determine whether the legislature expressed its intent regarding retroactive application by examining the specific language contained in the Act. Bourgeois, 00-1528 at p. 7, 783 So.2d at 1258. Act 40 contains a clear legislative expression of its intended temporal effect. Section 2 of the Act provides that its provisions are interpretive of La. R.S. 47:305.1 and "shall be applicable to all claims existing or actions pending on its effective date and to all claims arising or actions filed on and after its effective date." It is plainly the legislature's intent that this Act be applied both retroactively and prospectively. This matter was pending on the effective date of the Act, and the Act was therefore intended to be applied to this case. Thus, Act 40 will be applied unless retroactive application would violate the principles of separation of powers and independence of the judiciary.
In Unwired, this court recently addressed the issue of whether legislation designated as interpretive and intended to be applied retroactively violates the principles of separation of powers and independence of the judiciary. In that case, as in this one, the legislature passed an Act seeking to legislatively "overrule" a prior *544 judicial decision. This court concluded that by passing the Act to abrogate a court's interpretation and application of a long-standing revised statute, the legislature "clearly assumed a function more properly entrusted to the judicial branch of government." Unwired, 03-0732 at p. 18, 903 So.2d at 406. In finding the retroactive application of the Act unconstitutional, we stated:
As a court we have never entirely resolved the issue of whether legislation designated from the outset as interpretive violates the principles of separation of powers and independence of the judiciary. However, this Court has noted that arguably an interpretive enactment begins to give the legislature judicial power. Inherent problems with interpretive legislation are particularly brought to the fore in a situation like the one before this Court where the Legislature has expressly targeted an appellate court decision by professing to explain and interpret a statute and thus reach its "original" meaning, that is, the one the authors of the revised statute intended. Such legislation effectively constitutes the adjudication of cases in contravention of LA. CONST. ANN. Art. II, § 2.
The principle of separation of powers leaves no room for the adjudication of cases by the legislature, and this may be the true holding of certain Louisiana decisions. The principle of separation of powers does not exclude the authority of the legislature to enact clearly interpretive laws, clarifying the meaning of previously enacted texts outside the context of litigation. Of course, it is a different matter when the legislature actually amends previously enacted legislation by laws designated as interpretive. This again may be an improper exercise of power tending to attribute, contrary to constitutional guarantees, retroactive effect to new legislation.
The judiciary determines whether a statute enacted by the Legislature consists of substantive, procedural, or interpretive law for purposes of the statute's application. Thus, although the Legislature may never declare itself to be interpreting the law, it may in certain circumstances find itself to be the author of a so-called "interpretive" statute. Notwithstanding, it is not within the province of the Legislature to interpret legislation after the judiciary has already done so. Under our system of government, it is emphatically the province and duty of the judicial department to say what the law is. The interpretation of the law belongs to the judiciary, not the Legislature.
Id. at pp. 16-18, 903 So.2d at 404-05 (internal quotations, citations and footnotes omitted). We thus concluded that although the legislature had the authority to change the law following a judicial decision it did not favor, the changes could only have prospective application regardless of the legislature's indication to the contrary.
For the same reasons we expressed in Unwired only a few months ago, we conclude that Act 40 can only have prospective application. In passing Act 40, the legislature clearly sought to abrogate this court's interpretation of La. R.S. 47:305.1(B) in Archer Daniels. In the Unwired decision, we recognized that the legislature "may enact remedial legislation shortly following a court's decision that highlights an ambiguity or conflict in a statutory provision" because it is within the province of the legislature to clarify the law when the courts indicate the necessity of doing so. Id. at p. 16, 903 So.2d at 404. In the instant case, the exemption interpreted in Archer Daniels had been substantially the same since it was enacted *545 in 1959. Moreover, the decision in Archer Daniels highlighted no ambiguity or conflict present in the statute. Rather, the decision reaffirmed the basic analysis used in a previous decision of this court to interpret the phrase "exclusively in foreign or interstate coastwise commerce."[8] Thus, the situation in which the legislature may properly enact remedial legislation was not present in this instance.
In attempting to abrogate this court's interpretation of one of the exemptions provided in La. R.S. 47:305.1(B), the legislature improperly assumed the function of the judicial branch of government. Statutory construction and interpretation of legislative acts is solely a matter within the province of the judicial branch. Act 40 represents new substantive law passed under the guise of interpretive legislation. Accordingly, it can only have prospective effect and cannot be applied in this case.
Tax exemptions are an exceptional privilege that must be expressly and clearly conferred in plain terms. Showboat Star P'ship v. Slaughter, 00-1227, p. 10 (La.4/3/01), 789 So.2d 554, 560; McNamara v. Central Marine Serv., Inc., 507 So.2d 207, 208 (La.1987). Accordingly, they are strictly construed against the taxpayer. Id. A taxpayer must clearly, unequivocally, and affirmatively establish his entitlement to a tax exemption provided by law. Archer Daniels, 01-0511 at p. 11, 802 So.2d at 1278.
Mallard claims a tax exemption provided by La. R.S. 47:305.1(B), which, at the time the diesel fuel was purchased, provided that certain sales taxes "shall not apply to materials and supplies purchased by the owners or operators of ships or vessels operating exclusively in foreign or interstate coastwise commerce, where such materials and supplies are loaded upon the ship or vessel for use or consumption in the maintenance and operation thereof." For a taxpayer to qualify for this exemption, the taxpayer must establish each of these statutory elements: (1) he is an owner or operator of a ship or vessel purchasing materials or supplies; (2) the materials or supplies purchased are used or consumed in the maintenance or operation of the ship or vessel; and (3) the ship or vessel operates exclusively in foreign or interstate coastwise commerce. Id. at p. 5, 802 So.2d at 1275.
In concluding that Mallard was entitled to the exemption, the district court and the court of appeal focused exclusively on the third element of the exemption and failed to specifically consider whether Mallard's drilling barges were "ships or vessels" as those terms are used in the exemption. While Mallard is an owner or operator of the drilling barges described above, we find Mallard has failed to affirmatively establish that its drilling barges are "ships or vessels" as those terms are used in the exemption. Mallard attempted to establish that its barges were "vessels" and argued in memoranda filed with the lower tribunals and this court that its drilling barges could be classified as "vessels." The DOR, on the other hand, contends that the language of the exemption at issue provided in subsection (B) includes only "ships or vessels," and does not include *546 "barges" as does the exemption provided in subsection (A).
When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the legislature's intent. La. C.C. art. 9. It is presumed that every word and provision in a statute was intended to serve some useful purpose, that some effect is to be given to each provision, and that no words or provisions were used unnecessarily. ABL Mgmt., Inc. v. Board of Sup'rs of Southern Univ., 00-0798, p. 6 (La.11/28/00), 773 So.2d 131, 135. Conversely, it is not presumed that the legislature inserted idle, meaningless or superfluous language in a statute or that it intended any part of the statute to be meaningless, redundant or useless. Id. The courts have a duty, if possible, to adopt a statutory construction that harmonizes and reconciles the statute with other provisions. Id. Finally, courts should avoid a construction that creates an inconsistency when a reasonable interpretation can be adopted that does not do violence to the plain words of the statute and will carry out the legislature's intention. Id.
At the time Mallard purchased the diesel fuel, La. R.S. 47:305.1 provided in its entirety:
A. The tax imposed by R.S. 47:302(A)(1), 321(A)(1), and 331(A)(1) shall not apply to sales of materials, equipment, and machinery which enter into and become component parts of ships, vessels, or barges, including commercial fishing vessels, drilling ships, or drilling barges, of fifty tons load displacement and over, built in Louisiana nor to the gross proceeds from the sale of such ships, vessels, or barges when sold by the builder thereof.
B. The taxes imposed by R.S. 47:302 and R.S. 47:321 shall not apply to materials and supplies purchased by the owners or operators of ships or vessels operating exclusively in foreign or interstate coastwise commerce, where such materials and supplies are loaded upon the ship or vessel for use or consumption in the maintenance and operation thereof; nor to repair services performed upon ships or vessels operating exclusively in foreign or interstate coastwise commerce; nor to the materials and supplies used in such repairs where such materials and supplies enter into and become a component part of such ships or vessels; nor to laundry services performed for the owners or operators of such ships or vessels operating exclusively in foreign or interstate coastwise commerce, where the laundered articles are to be used in the course of the operation of such ships or vessels.
C. The exemption from the state sales tax provided in this Section shall be applicable to any sales tax levied by a local governmental subdivision or school board.
D. Repealed by Acts 1982, No. 56, § 4, eff. July 10, 1982.
As can be seen from the plain wording of this statute, it appears the legislature made a distinction between ships, vessels, and barges in the statute. Mallard does not contend, and we believe correctly so, that its drilling barges can be classified as "ships;" therefore, we will focus our analysis on whether its drilling barges are "vessels" for purposes of La. R.S. 47:305.1(B).
The exemption provided in subsection (A) applies to sales of certain things "which enter into and become component parts of ships, vessels, or barges including commercial fishing vessels, drilling, ships, or drilling barges" of a certain size built in *547 Louisiana. The subsection also exempts from certain taxes the gross proceeds from the sale of "such ships, vessels, or barges" when sold by their builders. Thus, subsection (A) creates an exemption designed to relieve Louisiana shipyards of a competitive disadvantage with shipyards in neighboring states. McNamara, 507 So.2d at 209. In contrast to the language used in subsection (A), subsection (B) creates an exemption from certain taxes for materials and supplies purchased by the owners or operators of ships or vessels operating exclusively in foreign or interstate coastwise commerce. Hence, subsection (A) refers to "ships, vessels, or barges," which specifically include commercial fishing vessels, drilling ships, or drilling barges, while subsection (B) refers only to "ships or vessels." As explained above, we must presume that the legislature deliberately omitted "barges" from the exemption provided in subsection (B), and that "barges" has a distinct meaning, rather than one that is meaningless or redundant.
As originally enacted in 1959, La. R.S. 47:305.1 made a similar distinction. At the time of its enactment, subsection (A) exempted from certain taxes sales of particular things "which enter into and become component parts of ships, vessels, including commercial fishing vessels, or barges" of a specified size built in Louisiana. The second part of the exemption referred to gross proceeds from the sale of "such ships, vessels, or barges," and has remained unchanged since the statute's enactment. In contrast to subsection (A), at the time of its enactment, subsection (B) referred only to the owners or operators of "ships or vessels" and omitted "barges." As originally enacted by Act No. 51 of 1959, the statute contained subsection (C) that provided:
C. The provisions of this section do not apply to drilling equipment used for oil exploitation or production unless such equipment is built for exclusive use outside the boundaries of the state and is removed forthwith from the state upon completion.
This exception, which referred to all exemptions granted in La. R.S. 47:305.1, was concerned with equipment built for certain use and was meant to apply to construction of ships, vessels, or barges. See McNamara, 507 So.2d at 210.
In 1982, the legislature repealed subsection (C) and amended subsection (A) to expressly include drilling ships and drilling barges within its provisions. Acts 1982, No. 56. See also McNamara, 507 So.2d at 210 n. 7. Thus, the exemption for ships, vessels, and barges built in Louisiana, and their component parts, now explicitly applied to drilling ships and drilling barges, and the requirement that the drilling equipment be built for exclusive use outside the boundaries of the state was repealed. Subsection (B) was not amended.
As can be seen from the history of the statute, the legislature was concerned with providing an exemption from sales taxes for barges, drilling ships, and drilling barges built in Louisiana. The exemption was enacted to aid the Louisiana shipbuilding industry. It does not appear it had the same concern for the owners or operators of barges, drilling ships, or drilling barges operating exclusively in foreign or interstate coastwise commerce. Had the legislature intended the exemption at issue to apply to barges or drilling barges, it could have done so by using the specific language it employed in other provisions of the same statute.
Nevertheless, Mallard contends that barges are included within various definitions of the term "vessel" found throughout the Revised Statutes, and that its drilling barges should therefore be considered "vessels." For example, La. R.S. *548 3:4602(14.1) defines a "seagoing vessel" for purposes of the Louisiana Weights and Measures Law as "a commercial ship, vessel, or barge of greater than fifty gross tons or ships, vessels, or barges in possession of an exemption certificate issued under the provisions of R.S. 47:305.1." Additionally, La. R.S. 34:851.2(1) defines "vessel" as used in Title 34, Navigation and Shipping, Chapter 4, Ships and Water Craft, Part IV, Motorboats and Vessels, as "watercraft and air boats of every description, other than a seaplane on the water, used or capable of being used as a means of transportation on water." When used in the subpart pertaining to Liability of Vessels, La. R.S. 34:801 defines "vessel" as "any steamship, steamboat, tug, towboat, barge, water craft, ship or vessel of any kind or description, whether foreign or domestic."
These definitions are of little use in determining the meaning of the term "vessel" as it is used in La. R.S. 47:305.1. Notably, each statutory definition of the word "vessel" is limited by its own terms to a particular Chapter or Part of the Revised Statutes. Additionally, there is no evidence that the legislature intended the word "vessel" as used in La. R.S. 47:305.1(B) to be interpreted by referring to one of several statutory definitions of the term that were enacted for different purposes. In construing tax laws, other statutes having other purposes are of little aid. See generally Orgeron v. Avondale Shipyards, Inc., 561 So.2d 38 (La.1990).
Mallard also argues that a barge has previously been found to be a "vessel" for purposes of general maritime law. In X-L Finance Co. v. Bonvillion, 257 La. 899, 244 So.2d 826 (1971), this court addressed the issue of whether a judgment debtor was a "seaman" and thus exempt from garnishment by virtue of a federal statute applying to any seaman. The debtor was a member of a crew of a barge used in offshore drilling operations. In determining whether the debtor was a "seaman," this court stated, "Although having no motive power of its own, this floating barge is used in navigable waters; it is thus a `vessel' for maritime law purposes." Because the debtor was permanently employed and performed all his duties on a "vessel," this court determined he was a seaman exempt from garnishment.
This court has also previously held that a barge is a vessel within the meaning of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), even when it has no motive power. Orgeron, 561 So.2d 38. The U.S. Supreme Court recently addressed the issue of whether a dredge[9] is a "vessel" under the LHWCA, and concluded that it is based partially on a federal law stating that in any Act passed after February 25, 1871, "the word `vessel' includes every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation on water." Stewart v. Dutra Constr. Co., 543 U.S. 481, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005). Because dredges served a waterborne transportation function by carrying machinery, equipment, and crew over water, the Court concluded they were "vessels" within the meaning of the LHWCA.
While it may be true that barges and drilling barges are considered "vessels" for purposes of general maritime law, we do not believe maritime jurisprudence, which is largely based on federal law, necessarily dictates that a drilling barge is a "vessel" for purposes of a Louisiana sales tax exemption. *549 The meaning of "vessel" for purposes of maritime law is often broadly construed as it involves situations wherein an injured worker is seeking compensation for injuries. In contrast, tax exemptions are to be strictly construed against the taxpayer.
This rejection of the general maritime definition of the term "vessel" is necessary due to the fact that the sales tax exemption at issue contains provisions specifically directed to "ships, vessels, or barges," and others that apply only to "ships or vessels." As stated previously, the legislature could easily have included drilling ships, drilling barges, or barges in subsection (B) had it so desired. Had the legislature not specified an exemption related to "ships, vessels, or barges, including commercial fishing vessels, drilling ships, or drilling barges" in subsection (A), thereby evidencing a difference among the categories, we might have been able to conclude that a drilling barge is intended to be included as a "vessel" as that term is used in subsection (B).[10]
Nevertheless, accepting Mallard's contentions regarding the meaning of "vessel" would ignore the different language employed by the legislature in the two subsections, a choice we must presume to have been deliberate. See Hall v. Brookshire Bros., Ltd. 02-2404, p. 19 (La.6/27/03), 848 So.2d 559, 571. Moreover, it would violate the principle that tax exemptions are to be strictly construed against the taxpayer. Finally, laws regulating the collection of taxes are sui generis and comprise a system to which general provisions of the law have little, if any, relevance. Collector of Revenue v. Olvey, 238 La. 980, 990, 117 So.2d 563, 566 (1959).
Having determined that there is a difference between a "vessel" and a "barge," we must now determine whether Mallard's drilling barge should be classified as a "vessel" or a "barge" for purposes of La. R.S. 47:305.1. A "vessel" is generally defined as "[a] craft, especially one larger than a rowboat, designed to navigate on water." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed.2000). A "barge" is generally defined as "[a] long, large, usually flatbottom boat for transporting freight that is generally unpowered and towed or pushed by other craft." Id. It appears that a major distinguishing factor between a "vessel" and a "barge" is that a barge has no motive power of its own and requires another craft to move. We therefore conclude that for purposes of the tax exemptions provided in La. R.S. 47:305.1, at least prior to the effective date of Act 40, a craft that has no motive power of its own and is required to be moved from place to place by another craft is more akin to a "barge" than a "vessel."
The testimony in this case reveals that Mallard's drilling barges cannot move under their own power and are towed from one job location to the next. Consequently, we find that Mallard's drilling barges should be classified as "barges" rather than "vessels" for purposes of La. R.S. 47:305.1. Accordingly, Mallard's barges do not meet the requirement of a "vessel" for purposes of the exemption at issue provided in La. R.S. 47:305.1(B). Because Mallard *550 has not shown that it is the owner or operator of "ships or vessels," we need not determine whether it "operated exclusively in foreign or interstate coastwise commerce." We must reverse the judgment of the court of appeal finding that Mallard is entitled to the exemption at issue provided by La. R.S. 47:305.1(B).
In addition to arguing it is entitled to the exemption provided by La. R.S. 47:305.1(B), Mallard contends it should be exempted from paying sales taxes on its purchases of diesel fuel used to power its drilling activities under La. R.S. 47:305(E), which states in pertinent part:
It is not the intention of any taxing authority to levy a tax upon articles of tangible personal property imported into this state, or produced or manufactured in this state, for export; nor is it the intention of any taxing authority to levy a tax on bona fide interstate commerce; however, nothing herein shall prevent the collection of the taxes due on sales of tangible personal property into this state which are promoted through the use of catalogs and other means of sales promotion and for which federal legislation or federal jurisprudence enables the enforcement of the sales tax of a taxing authority upon the conduct of such business. It is, however, the intention of the taxing authorities to levy a tax on the sale at retail, the use, the consumption, the distribution, and the storage to be used or consumed in this state, of tangible personal property after it has come to rest in this state and has become a part of the mass of property in this state.
Thus, this statute provides that while it is not the intention of any taxing authority to levy a tax on bona fide interstate commerce, it is the intention of such authorities to levy a tax on the sale at retail of tangible personal property after it has come to rest in this state and has become a part of the mass of property in this state. This court has previously determined that La. R.S. 47:305(E) "clearly intends taxation of property consumed in the state." Columbia Gulf Transmission Co. v. Broussard, 94-1650, p. 3 (La.4/10/95), 653 So.2d 522, 523, cert. denied, 516 U.S. 908, 116 S.Ct. 276, 133 L.Ed.2d 196 (1995).
In Columbia Gulf Transmission, this court was faced with the issue of whether La. R.S. 47:305(E) prohibits the imposition of a Louisiana use tax on "compressor fuel," which was defined as natural gas that is diverted from an interstate pipeline to power the compressors that propel the natural gas through the pipeline. The DOR sought to impose a use tax on the compressor fuel that was consumed in Louisiana after the natural gas was diverted to the compressor stations in Louisiana and consumed to power the engines that boosted the interstate gas pressure, which allowed gas to flow to Kentucky through underground interstate pipelines. The taxpayer argued that the tax was prohibited by La. R.S. 47:305(E) because the natural gas consumed as compressor fuel had not come to rest in the state and had not become a part of the mass of property in that state. This court disagreed, stating:
When the natural gas compressor fuel is consumed, it comes to rest and becomes a part of the state's property. Fuel must necessarily come to rest as it is consumed. It ceases to exist; it is terminated; it is used in Louisiana; it cannot be taxed in another state. Thus, the natural gas is subject to tax when it is consumed in the state under the language of the statute.
Id. at pp. 3-4, 653 So.2d at 524.
In the instant case, the Board determined, after listening to the testimony in this case and after receiving evidence, that the diesel fuel was delivered in *551 Louisiana to Mallard's drilling barges. The Board found that not only was the fuel delivered in Louisiana, but that it was consumed in Louisiana and was a Louisiana sale. The Board's factual determinations should not be set aside unless they are manifestly erroneous, St. Pierre's Fabrication & Welding, Inc. v. McNamara, 495 So.2d 1295, 1298 (1986), and we conclude the Board's findings that the fuel was sold, delivered, and consumed in Louisiana are adequately supported by the record.[11] As in Columbia Gulf Transmission, we find that when the diesel fuel was consumed in Mallard's drilling operations in Louisiana, it came to rest and became a part of the state's property. Additionally, we find that the sale of the diesel fuel, the delivery, and the consumption in Louisiana do not constitute "bona fide interstate commerce" as that phrase is used in La. R.S. 47:305(E). While Mallard's drilling activities might position it as an entity engaged in interstate commerce, the levy of a sales tax on its diesel fuel purchases that are sold, delivered, and consumed in Louisiana does not constitute a tax on "bona fide interstate commerce." Accordingly, we find the imposition of sales taxes on Mallard's purchases of diesel fuel that was consumed in the state is not prohibited by La. R.S. 47:305(E).
A determination that the tax exemptions provided by La. R.S. 47:305.1 do not apply is separate from a determination that the taxes imposed do not burden interstate commerce in violation of the Commerce Clause. See generally Archer Daniels, 01-0511 at p. 4, 802 So.2d at 1274. We have previously determined that "a local sale with a local delivery may be subjected to a sales tax even if the purchaser is engaged in foreign or interstate commerce within the meaning of the Commerce Clause." Id. (citing International Harvester Co. v. Indiana, 322 U.S. 340, 64 S.Ct. 1019, 88 L.Ed. 1313 (1944); Indiana v. Wood Preserving Corp., 313 U.S. 62, 61 S.Ct. 885, 85 L.Ed. 1188 (1941)).
A state tax statute that affects interstate commerce may survive a commerce clause challenge if the tax: (1) is applied to an activity having a substantial nexus with the taxing state; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to services provided by the taxing state. Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). See also Columbia Gulf Transmission Co., 94-1650 at p. 4, 653 So.2d at 524. We conclude each of the four prongs of this test has been satisfied in this case.
The sale at issue was made in Louisiana, the fuel was delivered in Louisiana, and the fuel was consumed in Louisiana. Clearly, the sale has a substantial nexus with Louisiana as "[i]t has long been *552 settled that a sale of tangible goods has a sufficient nexus to the State in which the sale is consummated to be treated as a local transaction taxable by that State." Oklahoma Tax Comm'n v. Jefferson Lines, Inc., 514 U.S. 175, 184, 115 S.Ct. 1331, 1338, 131 L.Ed.2d 261(1995). The second prong of the test seeks to ensure that each State taxes only its fair share of an interstate transaction by asking whether the tax is both internally and externally consistent. Id. We find the sales tax is fairly apportioned as it adds no burden to interstate commerce that intrastate commerce would not also bear and it does not reach beyond that portion of value that is fairly attributable to Mallard's economic activity within the state. Regarding this prong, the U.S. Supreme Court has stated:
We have therefore consistently approved taxation of sales without any division of the tax base among different States, and have instead held such taxes properly measurable by the gross charge for the purchase, regardless of any activity outside the taxing jurisdiction that might have preceded the sale or might occur in the future. Such has been the rule even when the parties to a sales contract specifically contemplated interstate movement of the goods either immediately before, or after, the transfer of ownership.
Id., 514 U.S. at 186-87, 115 S.Ct. at 1339, 131 L.Ed.2d 261. We therefore find the sales tax on diesel fuel is fairly apportioned. Likewise, the sales tax does not discriminate against interstate commerce as it applies equally to both interstate and intrastate commerce. Finally, the fourth prong requires "only that the measure of the tax be reasonably related to the taxpayer's presence or activities in the State." Id., 514 U.S. at 200, 115 S.Ct. at 1346, 131 L.Ed.2d 261. The Supreme Court has explained:
Interstate commerce may thus be made to pay its fair share of state expenses and contribute to the cost of providing all governmental services, including those services from which it arguably receives no direct benefit.
Id., 514 U.S. at 199-200, 115 S.Ct. at 1345, 131 L.Ed.2d 261 (internal quotation omitted) (emphasis in original). This prong is satisfied as the sales tax on the diesel fuel Mallard consumed in the state in connection with its drilling activities is clearly reasonably related to its presence and activities in Louisiana.
Relying on Maryland v. Louisiana, 451 U.S. 725, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981), Mallard argues that the flow of gas from the well to the ultimate consumer is nothing other than interstate commerce, and that the four prongs of the above test remain unsatisfied in this case. In Maryland v. Louisiana, Louisiana's first use tax of natural gas brought into the state which was not previously subjected to taxation by another state or the United States was invalidated under the Supremacy Clause and the Interstate Commerce Clause. In applying the above four-prong test, the Court found that the flow of gas from wells on the Outer Continental Shelf, through processing plants in Louisiana, and through interstate pipelines to the ultimate consumer in multiple states constitutes interstate commerce. The Court stated:
Louisiana argues that the taxable "uses" within the State break the flow of commerce and are wholly local events. But although the Louisiana "uses" may possess a sufficient local nexus to support otherwise valid taxation, we do not agree that the flow of gas from the wellhead to the consumer, even though "interrupted" by certain events, is anything but a continual flow of gas in interstate commerce. Gas crossing a state line at any stage of its movement to the ultimate *553 consumer is in interstate commerce during the entire journey.
Id., 451 U.S. at 754-55, 101 S.Ct. at 2133-34, 68 L.Ed.2d 576. After making these statements, the Court then applied the four-part test of Complete Auto Transit. In applying that test, the Court found that Louisiana's first use tax discriminated against interstate commerce in favor of local interests because of various tax credits and exclusions provided to local businesses. Because of this discrimination, the Court found that tax violated the Commerce Clause. In the instant case, however, each of the four prongs is satisfied and the Commerce Clause is not violated. The sales tax does not discriminate against interstate commerce as it applies equally to both interstate and intrastate commerce. While Mallard's drilling activities may constitute an involvement in interstate commerce, there is no constitutional prohibition against the imposition of sales taxes on diesel fuel sold, delivered and consumed in Louisiana during Mallard's drilling activities.

Conclusion
For all the above reasons, we find that Act 40 is inapplicable to the instant suit which was pending prior to the Act's effective date. Furthermore, we find that under the provisions of La. R.S. 47:305.1(B) as they existed prior to the effective date of Act 40, Mallard is not the owner or operator of a "vessel." Accordingly, it is not entitled to the exemption provided by La. R.S. 47:305.1(B). Furthermore, we find that the provisions of La. R.S. 47:305(E) do not prohibit the imposition of the sales tax on diesel fuel sold, delivered, and consumed in Louisiana. Finally, we conclude that the imposition of the tax does not violate the Commerce Clause. Mallard's request for a refund of the sales taxes at issue was properly denied by the DOR and the Board. The court of appeal's judgment to the contrary is erroneous. Consequently, the judgment of the court of appeal affirming the judgment of the district court is reversed.
REVERSED.
JOHNSON, J., concurs in part, dissents in part and assigns reasons.
WEIMER, J., concurs in the result.
JOHNSON, Justice concurring in part and dissenting in part.
I concur in the majority's conclusion that Act No. 40 of 2002 cannot be retroactively applied. However, I dissent from the holding that Mallard Bay is not entitled to the sales tax exemption provided in LSA-R.S. 47:305.1(B).
I first point out that the majority relied upon the Louisiana Board of Tax Appeals' finding that the diesel fuel was consumed in Louisiana. However, that finding is in no way supported by the record. The record contains the undisputed testimony of Bob Hebert, Mallard Bay's senior accountant for 1993 and comptroller for 1994 and 1995. Mr. Hebert testified that Mallard Bay conducts drilling activities, which require the consumption of diesel fuel, all along the Gulf Coast, including Louisiana, Texas, Mississippi, and Alabama. Mr. Hebert testified as follows:
Q. Okay. And my understanding of what you just said is that the vessels, meaning these barge rigs, would go up and down the Gulf Coast; is that correct?
A. That is correct.
Q. Does that include places other than Louisiana?
A. Yes.
Q. Does it include  can you specify with more particularity?

*554 A. Texas, along the Texas coast. We do a lot in the Galveston area, mid to upper Texas coast, mid  not much in Mississippi, but some extent, and in Alabama, mainly around the Mobile Bay area.
Q. Okay. And is there a utilization of these particular vessels outside the United States.
A. Yes.
* * *
Q. If you send a rig overseas or to another state, would it by necessity come back to New Iberia or would it stay in that location or how does that work?
A. It could stay in that location or, you know, it may come back. You know, it may never come back. It all depends, you know, whether there's work there or not.
* * *
Q. Okay. Is it fair to say then that these vessels are in continuous movement depending on where the activities may be?
A. Yes, that's correct.
Q. Okay. Now diesel fuel, if you purchase diesel fuel in the State of Louisiana with a given rig, does the  do these vessels, excuse me, work sometimes in international waters as well as state waters.
A. Correct.
Q. Okay. Do they, if you have the home port in Iberia, if you sent out a drilling barge, vessel, for activities in Texas, would it be more probable than not that you would have a full supply of that vessel at that time it left port.
A. Yeah, could be, fill it up from there or as operations continue we could . . . be buying it in Louisiana and the rig actually could be right across the state border. You could leave, you know, with fuel bought here but ends up being used out of state.
Mallard Bay also introduced into evidence the affidavit of its Vice-President of Finance, Geoff Jones. Mr. Jones attested as follows:
A review of the rig logs reflects that Mallard provides drilling services both in and outside of Louisiana waters. Mallard's drilling vessels performed drilling services throughout the Gulf Coast, including Louisiana, Texas, Mississippi, and Alabama. For the years commencing on January 1, 1993 through December 31, 1995, Mallard's ongoing operations included drilling wells for various clientele inside Louisiana waters, and into Texas, and other waters both in State waters and offshore on the Continental Shelf in international waters. A review of the business records pertinent to these time periods establish that virtually all drilling activity involving drilling vessels powered by diesel fuel purchased solely for that purpose. Diesel fuel powered the drilling vessels which were towed from drilling location to drilling location.

* * *
Furthermore, I dissent from the majority's finding that the barges at issue are not "vessels" within the meaning of LSA-R.S. 47:305.1. Indeed, it appears that the Legislature made a distinction between barges and vessels in the statute. As the majority points out, Subsection A of that statute states, "The tax imposed by taxing authorities shall not apply to sales of materials, equipment, and machinery which enter into and become component parts of ships, vessels, or barges, including commercial fishing vessels, drilling ships, or drilling barges. . . ." However, in Subsection B, the *555 exemption claimed herein, the Legislature did not include the term "barge." It appears paradoxical that the Legislature would specifically include "barges" and "drilling barges" as entities different from "vessels" in Subsection "A" of the statute, but use the term "vessel" in Subsection B to encompass barges and drilling barges.
Nevertheless, the law is clear: The words of a law must be given their generally prevailing meaning. LSA-C.C. art. 11. The term "vessel" is not defined in the Tax Code, and the term "barge" is not defined by statute. However, in many cases, the term "vessel" seemingly encompasses the term "barge." For example, LSA-R.S. 3:4602(14.1) provides, "`Seagoing vessel' means a commercial ship, vessel, or barge of greater than fifty gross tons or ships, vessels, or barges in possession of an exemption certificate issued under the provisions of R.S. 47:305.1." LSA-R.S. 34:801(1) provides, "`Vessel' means and includes any steamship, steamboat, tug, towboat, barge, water craft, ship or vessel of any kind or description, whether foreign or domestic." LSA-R.S. 9:5522(b) provides, "`Ship' means a tug, pushboat, pullboat, barge, dredge, or other vessel or watercraft of more than fifty tons gross weight to be constructed within the state of Louisiana."
Webster's New World Dictionary defines "vessel" as "a boat or ship, especially a relatively large one." WEBSTER'S NEW WORLD DICTIONARY 1484 (3rd College ed.1991). Black's Law Dictionary defines "vessel" as "a ship, brig, sloop, or other craft used  or capable of being used  to navigate on water." BLACK'S LAW DICTIONARY 1557 (7th ed.1999). "Barge" is defined in Webster's New World Dictionary as "a large boat, usually flat-bottomed, for carrying heavy freight on rivers, canals, etc." WEBSTER'S NEW WORLD DICTIONARY 111 (3rd College ed.1991).
In X-L Finance Co. v. Bonvillion, 257 La. 899, 244 So.2d 826 (1971), the plaintiff was a member of a crew of a barge used in offshore drilling operations. This Court stated, "Although having no motive power of its own, this floating barge is used in navigable waters; it is thus a `vessel' for maritime law purposes." Id. at 827.
Recently, the United States Supreme Court held that a dredge is a "vessel" for purposes of the Longshore and Harbor Workers' Compensation Act ("LHWCA"). Stewart v. Dutra Construction Co., 543 U.S. 481, 125 S.Ct. 1118, 160 L.Ed.2d 932 involved the "world's largest dredge," the Super Scoop. The Super Scoop had a captain and crew, navigational lights, ballast tanks, and a crew dining area. However, it had limited means of self-propulsion and was moved long distances by tugboat. It was able to navigate short distances by manipulating its anchors and cables. The Court stated:
At the time of the LHWCA's enactment, §§ 1 and 3 of the Revised Statutes of 1873 specified:
"In determining the meaning of the revised statutes, or of any act or resolution of Congress passed subsequent to February twenty-fifth, eighteen hundred and seventy-one, . . . [t]he word `vessel' includes every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation on water."
Id. at ___, 125 S.Ct. at 1124. The Court went on to state:
Section 3 requires only that a watercraft be "used, or capable of being used, as a means of transportation on water" to qualify as a vessel. It does not require that a watercraft be used primarily for that purpose.
Id. at ___, 125 S.Ct. at 1128 (Emphasis in original).
*556 Thus, in my mind, the term "vessel" is a generic term which encompasses various types of watercraft. The record establishes that the barge at issue, although it had no motive power of its own, was used in navigable waters and was "used, or capable of being used, as a means of transportation on water." It is nonsensical to suggest that the Legislature intended for a barge to be included in the definition term "vessel" for purposes of maritime law, but excluded from the definition for tax purposes. For these reasons, I believe that the term "vessel," when given its usual prevailing meaning, encompasses the term barge.
NOTES
[1] The lower courts, the parties, and the witnesses in this case have referred to the object in question alternatively as a "vessel," "drilling vessel," "barge," "drilling barge," "ship," "rig," "drilling rig," and "barge rig." To avoid confusion, this opinion will refer to the object in question as a "barge" or a "drilling barge."
[2] Acts 2003, No. 73 amended La. R.S. 47:301.5(B) to replace the specific statutory references with the term "taxing authorities." This amendment is not at issue in this case.
[3] Acts 2002, No. 41 also amended and reen-acted La. R.S. 47:305.1(C) in substantially the same way and was merged with Acts 2002, No. 40 pursuant to the statutory revision authority of the Louisiana State Law Institute. Both Acts designated the former subsection (C) as a new subsection (D).
[4] The remaining exceptions previously recognized include: (1) when a statute attempts to limit the constitutional power of the courts to review cases; (2) when the statute has been declared unconstitutional in another case; or (3) when an act which is the basis of a criminal charge is patently unconstitutional on its face and the issue is made to appear as an error patent on the face of the record. Mosing v. Domas, 02-0012, p. 11 n. 2 (La.10/15/02), 830 So.2d 967, 975 n. 2.
[5] Had the Act existed at the time the case was pending before the Board, it would not have had the authority to adjudicate the Act's constitutionality as applied to this case. Midboe v. Commission on Ethics for Pub. Employees, 94-2770, p. 7 (La.11/30/94), 646 So.2d 351, 355 ("An administrative agency does not have the authority to determine the constitutionality of statutes.")
[6] The district court's reasons for judgment indicate that additional post-trial memoranda were filed after Mallard filed the supplemental post-trial memorandum referred to above. These memoranda do not appear in the record. Nevertheless, even if the DOR filed a post-trial memorandum contesting the constitutionality of the Act as applied, a memorandum does not constitute a pleading and is therefore insufficient to properly challenge the constitutionality of a statute. See La. C.C.P. art. 852.
[7] The Attorney General has not made a separate appearance in this matter; however, this court's records indicate that the Office of the Attorney General was served with a copy of the DOR's writ application in which the constitutionality of the Act was addressed. It is also evident from our records that our Clerk of Court notified the Attorney General that the writ application had been granted and included the deadline within which a brief could be filed.
[8] In Archer Daniels, we reaffirmed this court's holding in Sales Tax Dist. No. 1 of Lafourche Parish v. Express Boat Co., Inc., 500 So.2d 364 (La.1987), indicating that the movement of the taxpayer's ships or vessels, and not the movement of the cargo, is determinative of whether the taxpayer's ships or vessels operate "exclusively in foreign or interstate coastwise commerce" within the meaning of La. R.S. 47:305.1(B). However, we criticized dicta in that case that implied federal jurisprudence interpreting the Commerce Clause should be used to interpret the phrase.
[9] The dredge at issue was described by the Court as "a massive floating platform from which a clamshell bucket is suspended beneath the water" to remove silt from the ocean floor. Stewart, 543 U.S. at ___, 125 S.Ct. at 1121, 160 L.Ed.2d 932.
[10] Because we have determined that Act 40 is inapplicable to this case, we express no opinion regarding whether the definition of "component parts" now contained in La. R.S. 47:305.1(C)(3) changes this analysis. Mallard contends that the portion of the definition of "component parts" that states, "ship, vessel, barge, commercial fishing vessel, drilling ship, or drilling barge (collectively referred to in this Section as `vessel' or `vessels')," attempts to define "vessel" as that term is used in La. R.S. 47:305.1(B). Because Act 40 cannot be applied to this case, we need not address this argument.
[11] At the hearing before the Board, Mallard introduced testimony that its barges operated along the Gulf Coast, including Texas, Mississippi, and Alabama, and occasionally internationally, and that fuel bought in Louisiana could be consumed in another state. On further examination, however, the testimony indicated that the witness could not point to any invoices submitted in support of Mallard's claim for refund that showed the diesel fuel was delivered or used in a state other than Louisiana. Testimony introduced by the DOR indicated that the invoices submitted by Mallard showed delivery of the fuel in Louisiana. This testimony also indicated that one or two invoices were written for a lease in a "split block" that could possibly have been outside the state's territory, but no one had checked. In light of the arguably conflicting evidence presented on this subject and the fact that Mallard had the burden to affirmatively establish that the fuel was consumed outside the territorial limits of Louisiana to prove its refund claim, we find the Board's finding that the fuel was consumed in Louisiana is reasonably supported by the record.