# ILLINOIS *v.* KENTUCKY

No. 106, Orig.  Argued March 18, 1991—Decided May 28, 1991

SOUTER, J., delivered the opinion for a unanimous Court.

*John Brunsman*, Assistant Attorney General of Illinois, argued the cause for plaintiff. With him on the brief was *Neil F. Hartigan*, Attorney General.

*Rickie L. Pearson*, Assistant Attorney General of Kentucky, argued the cause for defendant. With him on the brief were *Frederic J. Cowan*, Attorney General, and *James M. Ringo*, Assistant Attorney General.

JUSTICE SOUTER delivered the opinion of the Court.

In this case we return again to the history and geography of the Ohio River valley, as we consider the location of the boundary of the Commonwealth of Kentucky with the State of Illinois. We hold it to be the line of the low-water mark along the river's northerly shore as it was in 1792.

I

In July 1986, Illinois sought leave to file a bill of complaint against Kentucky, invoking this Court's original jurisdiction to resolve a disagreement about the location of the common boundary of the two States. See U. S. Const., Art. III, §2. Illinois asked the Court to declare "the boundary line . . . to be the low-water mark on the northerly shore of the Ohio River as it existed in 1792," Report of Special Master 1–2, and to enjoin Kentucky "from disturbing in any manner the State of Illinois or its citizens from the peaceful use, and enjoyment of all land, water and jurisdiction within the boundaries of Illinois as established by the Court," id., at 2. We granted leave to file the bill of complaint, 479 U. S. 879 (1986), and appointed the Honorable Robert Van Pelt as Special Master.*

In its answer to the complaint, Kentucky denied that the boundary was the 1792 line and claimed it to be the river's northerly low-water mark "as it exists from time to time." The answer raised the "affirmative defenses" of acquiescence and laches, and invoked certain "principles of riparian boundaries." Report of Special Master 2.

The parties spent the next three years in discovery and, after submitting evidence to the Special Master in January 1990, were granted additional time to develop the evidentiary record on Kentucky's claim of prescription and acquiescence. After receiving this evidence in April 1990, the Special Master submitted a report to this Court, which was ordered filed. 498 U. S. 803 (1990).

The Special Master recommended that we (1) determine the boundary between Illinois and Kentucky to be the "low-water mark on the northerly side of the Ohio River as it existed in the year 1792"; (2) find that the record fails to "sup-

---

*In June 1988, we appointed a new Special Master, Matthew J. Jasen, Esq., to replace Judge Van Pelt, who had died in April 1988. 487 U. S. 1215.

port the Commonwealth of Kentucky's affirmative defenses"; (3) find that the construction of dams on the Ohio River has caused "the present low-water mark on the Illinois side of the river [to be] farther north than it was in 1792"; and (4) order the two States' common boundary to be determined, "as nearly as [the 1792 line] can now be ascertained, . . . either (a) by agreement of the parties, (b) by joint survey agreed upon by both parties, or (c) in the absence of such an agreement or survey, [by the Court] after hearings conducted by the Special Master and the submission by him to the Court of proposed findings and conclusions." Report of Special Master 48–49.

Kentucky has filed exceptions to the Special Master's report. While Kentucky challenges many of the factual findings, its primary dispute is with the conclusion that Kentucky has failed to prove its claim, styled as an affirmative defense, that under the doctrine of prescription and acquiescence the boundary is the low-water mark as it may be from time to time.

## II

## A

We agree in large measure with the Special Master's report. The threshold issue presented in this case was resolved in *Ohio* v. *Kentucky*, 444 U. S. 335 (1980), in which we held that Kentucky's boundary with Ohio was the northerly low-water mark of the Ohio River as it was in 1792. We based that holding on the history of Virginia's 1784 cession to the United States of the lands "northwest of the river Ohio" and Kentucky's succession to Virginia's northwest boundary upon reaching statehood in 1792. *Id.*, at 337–338. We relied on the prior opinion in *Indiana* v. *Kentucky*, 136 U. S. 479, 518–519 (1890), in which Justice Field, for a unanimous Court, reviewed this history and held that Kentucky's boundary with Indiana followed the low-water mark on the northerly shore of the Ohio River "when Kentucky became a State." *Ibid.* The same history and precedent that sup-

plied the general rule for determining the boundary separating Kentucky from its neighboring States of Ohio and Indiana on the Ohio River also govern the determination of Kentucky's historical boundary on that river with Illinois.

Kentucky has, indeed, conceded that "if this case were before the Court simply as a *matter of law, Ohio* v. *Kentucky* . . . would be controlling precedent." Exceptions of Commonwealth of Kentucky 9 (emphasis in original). Kentucky's exceptions assume, rather, that the case does not turn on the issue of law decided in *Ohio* v. *Kentucky,* but on the "factual issue of acquiescence which Kentucky has raised as an affirmative defense on the question of its boundary with Illinois." Exceptions of Commonwealth of Kentucky 9–10. Kentucky contends that it has long asserted, and Illinois has acquiesced in the assertion, that the common boundary of the two States is the low-water mark of the Ohio River, not as it was in 1792, but as it may be from time to time.

Although Kentucky has styled its acquiescence claim an affirmative defense, this "defense," if successfully proved, would not only counter Illinois' boundary claim but also establish Kentucky's own position. To do this on a theory of prescription and acquiescence, Kentucky would need to show by a preponderance of the evidence, first, a long and continuous possession of, and assertion of sovereignty over, the territory delimited by the transient low-water mark. Long-standing "[p]ossession and dominion are essential elements of a claim of sovereignty by prescription and acquiescence." *Georgia* v. *South Carolina,* 497 U. S. 376, 389 (1990). Kentucky would then have the burden to prove Illinois' long acquiescence in those acts of possession and jurisdiction. As we stated in *Oklahoma* v. *Texas,* 272 U. S. 21, 47 (1926), there is a "general principle of public law" that, as between States, a "long acquiescence in the possession of territory under a claim of right and in the exercise of dominion and sovereignty over it, is conclusive of the rightful authority." See also *Georgia* v. *South Carolina, supra,* at 389 ("[L]ong

acquiescence in the practical location of an interstate boundary, and possession in accordance therewith, often has been used as an aid in resolving boundary disputes" between States).

The record developed before the Special Master in this case fails to support Kentucky's claim of sovereignty by prescription and acquiescence. After a thorough review of the voluminous evidence presented by both States, the Special Master concluded that Kentucky had proved neither long and continuous action in support-of its claim to a boundary at the northerly low-water mark as it might be from time to time, nor Illinois' acquiescence in that claim. While Kentucky's many exceptions to the extensive factual findings on these issues do not merit discussion *seriatim*, an examination of a few will indicate the evidentiary support generally for the Special Master's conclusions.

The Special Master first assessed the evidence bearing on Kentucky's exercise of dominion. According to Kentucky's view of the boundary, for example, any permanent structure extending out over the water from the river's northern bank would be within Kentucky's territory and subject to its taxing power, one of the primary indicia of sovereignty. The record in this case, however, shows that Kentucky has imposed a property tax on only 3 of the 15 structures that extend out, into, or over the water from the Illinois shoreline. Of the three affected taxpayers, one who received a Kentucky tax bill for property extending south into the river was also taxed on the same structure by Illinois, and another paid the Kentucky bill only under protest, "claiming that the property [taxed was] within the State of Illinois." Report of Special Master 37. The remaining 12 structures extending south into the river from Illinois have never been taxed by Kentucky.

Kentucky advanced what it took to be a stronger claim to having exercised exclusive taxing jurisdiction right up to the transient low-water mark by offering evidence of its ad valo-

rem taxation of barges and other watercraft traveling on the river. But this evidence simply fails to speak directly to the boundary issue in this case. Vessels traveling the river usually follow a sailing line charted by the United States Army Corps of Engineers which, for most of the stretch in question, is either close to the center of the river or near the Kentucky shore. Illinois does not dispute that the sailing line, like most of the river, is within the boundary and jurisdiction of Kentucky. *Id.*, at 38. The territory in question, rather, is thought to be a comparatively narrow sliver of the Ohio along its northerly shore, where barges and watercraft would rarely venture. As to the sliver, Kentucky's acts of taxation have been, at best, equivocal, and the Special Master was accordingly correct when he observed that the fact of Kentucky's taxation of barges "traveling on the Ohio River within the acknowledged jurisdiction of Kentucky, does not support Kentucky's claim of exclusive jurisdiction of the entire breadth of the river." *Ibid.*

This evidence of Kentucky's failure to engage in consistent and unequivocal acts of occupation and dominion does not stand alone, however, for we are concerned not only with what its officers have done, but with what they have said, as well. And what they have said has, in several instances, supported Illinois' claim. The Legislative Research Commission of the Kentucky General Assembly and the Attorney General of Kentucky have each taken the position in the recent past that Kentucky's northern border is the 1792 low-water mark. An Information Bulletin issued by the Legislative Research Commission in December 1972 states that "'Kentucky's North and Western boundary, to-wit, the low-water mark on the North shore of the Ohio River as of 1792 has been recognized as the boundary based upon the fact that Kentucky was created from what was then Virginia.'" *Id.*, at 15. An earlier opinion by the Commonwealth's Attorney General issued in 1963 asserted that the "'law, of course is that the boundary line between the states of Indiana and

Kentucky is the low-water [mark] on the north shore of the Ohio as it existed when Kentucky became a state in 1792.'" *Id.*, at 12. These statements came to our attention in Kentucky's last boundary case in this Court, where we found it "of no little interest" in deciding *Ohio* v. *Kentucky*, 444 U. S., at 340–341, that these "Kentucky sources themselves, in recent years, have made reference to the 1792 low-water mark as the boundary." It is hardly of less interest this time.

Just as this representative evidence fails to indicate any longstanding exercise of occupation and dominion of the disputed area by Kentucky, the record is equally unsupportive of the claim of Illinois' acquiescence. It is true that the Illinois Constitution of 1818 described the State's boundary with Kentucky on the Ohio River simply as following "along its north-western shore," Ill. Const., Preamble (1818), and the same description was employed in the State Constitutions of 1848 and 1870, see Ill. Const., Art. I (1848), Ill. Const., Art. I (1870). But these are verbatim recitations of the congressional language describing Illinois' boundary in the State's Enabling Act of April 18, 1818, ch. 67, 3 Stat. 428, and the Special Master correctly reasoned that "[w]hat Congress intended to be the southern boundary of Illinois, was the same southern boundary granted the states of Ohio and Indiana when they were formed. . . . Illinois, like Ohio and Indiana, was created from the territory ceded by Virginia to the United States. . . ." Report of Special Master 28. Although the current version of the Illinois Constitution, adopted in 1970, omits any description of the State's boundaries, the 1870 Constitution's language remained the reference point in the most recent Illinois case dealing with the State's river boundary that has come to our attention. See *People ex rel. Scott* v. *Dravo Corp.*, 10 Ill. App. 3d 944, 944–945, 295 N. E. 2d 284, 285 (1973), cert. denied, 416 U. S. 951 (1974).

The courts of Illinois, indeed, for some time took an even less hospitable view of Kentucky's interests than the Illinois Constitution did. In *Joyce-Watkins Co.* v. *Industrial Comm'n*, 325 Ill. 378, 381, 156 N. E. 346, 348 (1927), the State Supreme Court adopted a theory that would have ratchetted the boundary line forever southward toward the deepest point of the river, by holding the boundary to be the low-water mark on the northerly shore of the river at the "point to which the water receded at its lowest stage." This description of the boundary was followed by Illinois courts until at least 1973, see *People ex rel. Scott* v. *Dravo Corp.*, *supra,* and while it plainly conflicts with our decisions in *Indiana* v. *Kentucky*, 136 U. S. 479 (1890), and *Ohio* v. *Kentucky, supra*, its use over nearly 50 years shows that Illinois did not acquiesce in any claim by Kentucky to a low-water mark that might edge northward over time.

Such was the force of the evidence adduced, and such was its failure to support Kentucky's claim of prescription and acquiescence.

### B

Kentucky's other affirmative defenses are likewise unavailing. The Special Master correctly observed that the laches defense is generally inapplicable against a State. See *Block* v. *North Dakota ex rel. Bd. of Univ. and School Lands*, 461 U. S. 273, 294 (1983) (O'CONNOR, J., dissenting) (collecting authorities); *Guaranty Trust Co.* v. *United States*, 304 U. S. 126, 132–133 (1938); cf. *Weber* v. *Board of Harbor Comm'rs*, 18 Wall. 57, 70 (1873) (statutes of limitations generally not applicable to State). Although the law governing interstate boundary disputes takes account of the broad policy disfavoring the untimely assertion of rights that underlies the defense of laches and statutes of limitations, it does so through the doctrine of prescription and acquiescence, see generally *Georgia* v. *South Carolina, supra*, which Kentucky has failed to satisfy.

Kentucky's affirmative defenses based on the "principles of riparian boundaries, including accretion, erosion and avulsion," require no extended consideration, for Kentucky concedes that these would affect the ultimate boundary determination only if it prevailed on the issues of prescription and acquiescence. Exceptions of Commonwealth of Kentucky 48–49 ("It is Kentucky's position that if it prevails on its affirmative defense of acquiescence, then the well-recognized principles of accretion, erosion and avulsion would obviously apply to a current shoreline boundary as it may change from time to time"). We have previously held as much, concluding that "the well-recognized and accepted rules of accretion and avulsion attendant upon a wandering river" have no application to Kentucky's Ohio River boundary because of the "historical factors" stemming from the cession by Virginia of the land northwest of the river to the United States. *Ohio* v. *Kentucky, supra,* at 337.

Kentucky's final exception to the Special Master's report goes to the finding in Part III.C. that construction of dams on the river has permanently raised its level above that of 1792, consequently placing the present low-water mark on the Illinois side farther north than it was in 1792. Kentucky calls any question about the relative locations of the 1792 line and today's low-water mark premature, and we agree. Indeed, the Special Master himself suggested that this issue might, if necessary, "be determined at a later date," Report of Special Master 47, after he had made further recommendations to resolve any disputes the parties may have about the exact location of the 1792 line.

### III

The exception of the Commonwealth of Kentucky to Part III.C. and Recommendation (3) of the report of the Special Master, as to the effect of modern dams on the level of the Ohio River, is sustained. Kentucky's other exceptions are overruled. The report, save for Part III.C. and Recommendation (3), is adopted, and the case is remanded to the Special

Master for such further proceedings as may be necessary to prepare and submit an appropriate decree for adoption by the Court, locating the 1792 line.

*It is so ordered.*