# United States Court of Appeals
## For the First Circuit

No. 08-1244

FIRST SPECIALTY INSURANCE CORPORATION,

Plaintiff, Appellee,

v.

AMERICAN HOME ASSURANCE CO.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Margaret J. Kravchuk, U.S. Magistrate Judge]

Before

Torruella, Boudin, and Howard,
Circuit Judges.

Robert J. Murphy, with whom Holbrook & Murphy, was on brief for appellant.

Elizabeth C. Sackett, with whom Barbara O'Donnell and Robinson & Cole, LLP, were on brief for appellee.

February 27, 2009

**TORRUELLA**, **Circuit Judge**. In this insurance case, American Home Assurance Co. ("American") seeks to recover pursuant to an insurance policy that First Specialty Insurance Corporation ("First Specialty") issued to Maine Coast Marine Construction, Inc. ("MCMC"). The case presents us with two questions: (1) whether a "watercraft" exclusion in the policy First Specialty issued to MCMC applies to a barge being pulled by a tug and (2) whether Maine law would bar all recovery if the barge is excluded, even though the tug is not excluded. The district court found the exclusion barred all recovery and granted summary judgment to First Specialty. After careful consideration, we affirm.

## I. Background

For the purposes of summary judgment, the facts are as follows. Fore River Dock & Dredge, Inc. ("FRDD") hired MCMC to deliver a construction barge, the DS64, to a site on the Merrimack River in Newburyport, MA, using a tug, the Seawind II. On December 11, 2002, Guy Splettstoesser, an employee and part-owner of MCMC, set out from Gloucester, MA, using the tug to push the barge. On account of deteriorating weather conditions, Splettstoesser went from pushing the DS64 with the Seawind II to towing it using a cable. As he attempted to maneuver the tug and barge to enter the Merrimack River, strong winds pushed the barge alongside the tug and then pushed both out of the channel, grounding them on Plum Island.

-2-

First Specialty had issued an insurance policy to MCMC, the company that was actually operating the Seawind II as it towed the DS64. American had issued an insurance policy to FRDD, the company that hired MCMC to deliver the barge. As a result of a settlement with FRDD, American has incurred expenses of approximately $372,000. In response, American obtained a settlement from MCMC and Splettstoesser in a subrogation suit that American brought on behalf of FRDD. MCMC and Splettstoesser agreed to judgment being entered in favor of American against themselves in the amount of approximately $372,000, providing, however, that American would seek to collect the money from First Specialty, MCMC's insurer. First Specialty then sought declaratory relief against American to the effect that it was not liable for these damages.

Through this procedural history, American now stands in the shoes of MCMC and seeks to recover on MCMC's insurance policy with First Specialty. This policy obliges First Specialty to pay damages that MCMC is legally obligated to pay because of "bodily injury" or "property damage" resulting from an "occurrence." An "occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The policy contains the following exclusion:

> 2. Exclusions
> This insurance does not apply to:
> ...
> g. Aircraft, Auto or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".
This exclusion does not apply to:
(1) A watercraft while ashore on premises you own or rent;
(2) A watercraft you do not own that is:
     (a) Less than 26 feet long; and
     (b) Not being used to carry persons or
         property for a charge[.]

The tug, the Seawind II, is 25.5 feet long, and it is undisputedly not excluded. The barge, the DS64, is 150 feet long. The DS64 served as a floating platform for marine construction projects, similar to floating docks common at marinas. The DS64 traveled through the water to arrive where it was needed. Thereafter, it served as a floating work platform. The DS64 had no motorized propeller or means of self-propulsion, but relied on tugboats to move and position it. Furthermore, the DS64 had no means of steering or navigating, no crew, and was not required to be, nor was it, inspected by or registered with the United States Coast Guard. Neither the tug nor the barge were used to ferry persons or property for a charge.

## II.  Discussion

On appeal of grants of summary judgment, we apply de novo review to any legal issues and to the question of whether there exists a genuine dispute of material fact requiring a trial. New

Eng. Surfaces v. E.I. du Pont de Nemours & Co., 546 F.3d 1, 8 (1st Cir. 2008).

Though a shipwreck figures in this case, the policy at issue is a general commercial liability policy and the case comes before us under our diversity jurisdiction, not under our maritime jurisdiction. There is no dispute that we must apply Maine law to resolve the two issues in this appeal.

### A. Does the watercraft exclusion apply to the DS64?

Maine law on insurance policy interpretation can be set forth as follows:

> Whether a given insurance contract is ambiguous is a question of law for the court. "The language of a contract of insurance is ambiguous if it is reasonably susceptible of different interpretations." In addition, "[a] policy is ambiguous if an ordinary person in the shoes of the insured would not understand that the policy did not cover claims such as those brought . . . ." Nevertheless, "the court must interpret unambiguous language in a contract according to its plain and commonly accepted meaning." Finally, in determining whether an insurance contract is ambiguous, the long-standing rule in Maine requires an evaluation of the instrument as a whole.
>
> A contract of insurance, like any other contract, is to be construed in accordance with the intention of the parties, which is to be ascertained from an examination of the whole instrument. All parts and clauses must be considered together that it may be seen if and how far one clause is explained, modified, limited or controlled by the others.

Apgar v. Commercial Union Ins. Co., 683 A.2d 497, 498 (Me. 1996) (quoting Me. Drilling & Blasting, Inc. v. Ins. Co. of N. Am., 665

A.2d 671, 674-75 (Me. 1995)) (alterations in original) (citations omitted).

### 1. **The DS64 is a watercraft**.

The first question we must confront is the meaning of the term "watercraft." First, it cannot be reasonably questioned that a watercraft is a craft for use in or on water. And we can see no reason to disagree with the district court's conclusion, made after consultation with the Oxford English Dictionary, that "craft," in this context, refers to vessels of all kinds for water carriage. First Specialty Ins. Corp. v. Me. Coast Marine Constr., Inc., 532 F. Supp. 2d 188, 196 n.5 (D. Me. 2008) (citing 3 Oxford English Dictionary 1104, "craft" meaning V (2d ed. 1989) [hereinafter OED]); see also 19 OED 992, "watercraft" def. 2 (defining the term as a "vessel that plies on the water; such vessels collectively"). Under this definition, it would be plain and commonly accepted that the DS64, which is a vessel for use in the water, and which moved across water to reach its destination, was a watercraft. See 19 OED 574, "vessel" def. 4 (defining "vessel" as "[a]ny structure designed to float upon and traverse the water for the carriage of persons or goods; a craft or ship of any kind, now usually one larger than a rowing-boat and often restricted to sea-going craft or those plying upon the larger rivers or lakes.").

Though no Maine case addresses the meaning of this term, persuasive precedent from other jurisdictions supports this

-6-

conclusion. See, e.g., Terra Res., Inc. v. Lake Charles Dredging & Towing, Inc., 695 F.2d 828, 831 n.7 (5th Cir. 1983) (noting that a watercraft "exclusion clearly applies to the movements of the barges themselves," but allowing recovery on other grounds); Pa. Nat'l Mut. Cas. Ins. Co. v. S. State, Inc., No. 07-2989, 2008 U.S. Dist. LEXIS 98456, at *22-23 (D.N.J. Dec. 3, 2008) (holding, on summary judgment, that "[a]lthough a work-barge is not used in the same way as most other watercraft, and although it serves important mining functions in addition to water transport, it is nonetheless clearly within the meaning of 'watercraft' contemplated by the insurance policy."); Henry v. S. La. Sugars Coop., Inc., 957 So. 2d 1275, 1278-79 (La. 2007) (finding, on summary judgment, no coverage under a watercraft exclusion for a docked barge); Sloan Steel Erectors & Equip. Rental, Inc. v. Ill. Union Ins. Co., 551 N.Y.S.2d 136, 136 (N.Y. App. Div. 1990) (per curiam) ("[A] 12-foot-by-31-foot barge is a 'watercraft.'"); see also Illinois v. Kentucky, 500 U.S. 380, 386 (1991) (concluding that Kentucky's evidence of taxation "of barges and other watercraft" failed to establish its territorial claims against Illinois).

Cases suggesting otherwise are easily distinguishable in that they involve the land-based use of a barge or its equipment. See Consol. Am. Ins. Co. v. Mike Soper Marine Servs., 951 F.2d 186, 189 (9th Cir. 1991) (finding "ambiguity in the word watercraft" in the context of deciding that a watercraft exception did not apply

-7-

when a barge-mounted crane amputated an arm); <u>Ison</u> v. <u>Roof</u>, 698 F.2d 294, 298 (6th Cir. 1983) (finding coverage despite a watercraft exclusion where a pleasure boat struck a work barge docked at a coal conveyor facility, since the policy showed it was intended to cover the work done at such a facility and since the barge "was used as a base for the conveyor and was not intended to be used and was not being used as a transportation vessel"); <u>Ayers</u> v. <u>C&D Gen. Contractors</u>, 237 F. Supp. 2d 764, 770 (W.D. Ky. 2002) (relying on the above two cases to find coverage where a crane mounted on a barge collapsed, reasoning "[t]he barge was not used for transportation during Ayers's employment, it merely enabled work underneath the docks").

American argues that a watercraft must have its own means of propulsion. But we see nothing in that term's plain meaning that suggests such a limitation. Further, the cases American points to are inapposite. American first relies on a nineteenth century British case, which it argues holds that a barge is not a vessel under a particular British law. <u>Blanford</u> v. <u>Morrison</u>, (1850) 117 Eng. Rep. 633, 634-35 (Exch. Ch.). But, the British law at issue regulated deliveries by a "lighter, vessel, barge, or other craft" and the opinion simply dealt with whether delivery by coal brig met that definition. <u>Id.</u> Thus, this case does not speak to whether a barge is considered a watercraft.

American next relies on a Louisiana case in which the court found a barge was not a "vessel" under the relevant tax code. Mallard Bay Drilling, Inc. v. Kennedy, 914 So. 2d 533, 545-49 (La. 2005). But, in that case, the statute dictated that result by applying one subsection to "ships, vessels, or barges" and the next only to "ships or vessels," thereby suggesting a deliberate omission of barges. Id. In fact, that decision made clear that its resolution of tax law was specialized and bore little relation to "general provisions of the law." Id. at 549.

Finally, American points to a unpublished case from Michigan to argue that a means of propulsion is required for something to be a watercraft. Russian Am. Ass'n of Detroit v. Hastings Mut. Ins. Co., No. 206086, 1999 Mich. App. LEXIS 1599, at *5 (Mich. Ct. App. Apr. 6, 1999). There, in concluding that a rowboat accident was excluded under a watercraft exclusion, the court noted:

> The dictionary definition of "watercraft" is "a boat or ship." A "boat" is "a vessel for transport by water, propelled by rowing, sails, or a motor." Random House Webster's College Dictionary, (1997). A rowboat is clearly a watercraft within the common definition of that term.

Id. As is evident from this quotation, that court simply noted that some boats have a source of propulsion. That court easily concluded that a rowboat was a watercraft and never considered the problem of a barge. Rather, it simply took one definition of

-9-

"boat" that met the facts in that case. It is by no means clear that to be a boat a vessel must be "propelled by rowing, sails, or a motor." Further, though "boats or ships" fit the definition of "watercraft," as we have described above, that term plainly also includes vessels. And so, if we felt the need to analogize to other terms and contexts in order to reach a result, we need look no further than the Supreme Court, which has rejected the idea that a lack of propulsion prevents a barge from being considered a vessel. Norton v. Warner Co., 321 U.S. 565, 571 (1944) (finding that where "vessel" is defined as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water", "[a] barge is a vessel within the meaning of the [Longshoremen's and Harbor Workers' Compensation Act] even when it has no motive power of its own, since it is a means of transportation on water."), overruled on other grounds by McDermott Int'l, Inc. v. Wilander, 498 U.S. 337 (1991). Thus, we reject American's arguments that the broad term "watercraft" is limited to vessels with a means of propulsion or is ambiguous.

American raises several other logical and evidentiary arguments, which we address in turn. First, American points to the district court's acknowledgment that "there might be some room to quibble over whether a float or a barge tied to a dock or mooring might fairly be regarded as a watercraft." First Specialty, 532 F. Supp. 2d at 196. American argues that since it would not make

-10-

sense for a barge to move in and out of coverage, an unmoored barge must also not be a watercraft. We reject this argument. As our above distinctions with Consolidated American, Ison, and Ayers suggest, there may be valid reasons for concluding certain moored barges being used for industrial purposes are not watercraft under an insurance policy where an injury results from a purely land-based industrial use of the barge or its equipment. But this does not establish that all barges cease being watercraft when docked. Thus, American's fear that barges will routinely move in and out of coverage is not realized, and we have no need to abandon the plain meaning of the term "watercraft."

American next points to two pieces of deposition testimony to argue for its interpretation. Specifically, American relies on the testimony of Roger Hale, an owner of FRDD, and John Naughton, an alleged agent of First Specialty. But, "[t]he interpretation of an unambiguous contract 'must be determined from the plain meaning of the language used and from the four corners of the instrument without resort to extrinsic evidence.'" Am. Prot. Ins. Co. v. Acadia Ins. Co., 814 A.2d 989, 993 (Me. 2003) (quoting Portland Valve Inc. v. Rockwood Sys. Corp., 460 A.2d 1383, 1387 (Me. 1983)). Thus, we need not consider this testimony. American contends that we should nonetheless consider the testimony of Mr. Naughton to be a significant admission against interest. American claims that Naughton stated that "watercraft" referred to floating

objects that had a means of propulsion. But American has mischaracterized the record. In the relevant excerpt, Naughton states that he "would say a watercraft is any waterborne vessel, flotation device, probably should have them propulsion of some kind, or able to be propelled in some way, but it's got to be something that's used on the water" (emphasis added). Thus, even if Naughton was First Specialty's agent, a proposition which is disputed, he did not admit that a watercraft must have its own means of propulsion, but only that it must be able to be propelled. The DS64 clearly can be propelled, and was so propelled through force applied to it by the Seawind II.

Finally, American contends that a question on the insurance application reveals that watercraft are distinct from floats, since that application asks the insured to identify all "watercraft . . . and floats." But this conjunctive phrasing does not indicate that the terms are exclusive and does not overcome the unambiguous meaning we have described above.

## 2. **Splettstoesser was operating the DS64**.

Having established that the DS64 was a watercraft, we must ask whether it was a "watercraft owned or operated by or rented or loaned to" the insured. It is undisputed that MCMC did not own the DS64, and First Specialty has not contended that MCMC rented or was loaned the barge. Thus, we must decide whether

moving the barge by application of force created by the Seawind II constituted operation.

Relying on the plain meaning of the term, we conclude that Splettstoesser was operating the DS64 using the Seawind II. "Operation" plainly includes manipulation by application of an exterior force. For example, definitions of "operate" in the Oxford English Dictionary include "exercise force or influence, produce an effect, act, work," "[t]o bring force or influence to bear *on* or *upon*," "[t]o effect or produce by action or the exertion of force or influence; to bring about, accomplish, work," and "[t]o direct the working of, to manage, conduct, work (a railway, business, etc.)". See 10 OED 847-48, "operate" defs. 1, 2, 5, and 7 (emphasis in original). There is no ambiguity here since it can fairly and plainly be said that Splettstoesser was exercising force to produce an effect on the DS64 and direct its functioning. In fact, Splettstoesser's deposition establishes that he maneuvered the Seawind II in such a manner as to allow the DS64 to properly turn behind him.

American argues that one would not say that pulling a waterskier or a log constitutes operation. But a waterskier is distinguishable by virtue of the fact that his or her functioning is also controlled by independent volition. Further, we do believe that pulling a log constitutes operating on the log, just as pulling a trailer using a truck would be operating the trailer.

-13-

American also points to a federal statute that regulates tugboat operators, noting that it imposes no restriction based on what is pulled. See 46 U.S.C. § 8904(a). But it was never disputed that a tugboat pilot is operating the tugboat. That such operation is regulated by statute, whereas operation of pulled vessels is not regulated, does not establish that pulling a vessel is not operating that vessel. Thus, we see no ambiguity in the term "operated by" and conclude that Splettstoesser was operating the DS64.

In light of these holdings regarding the plain meaning of the terms "watercraft" and "operated by," we need not take recourse to guessing the intent of the parties. Nonetheless, we pause to note that this holding comports with such likely intent, as ascertained from an examination of the whole policy, as is permitted by Maine law. The purpose of the policy was not to provide blanket coverage of the tugboat, but rather to provide general commercial liability insurance in the event of certain accidents. The clear purpose of a watercraft exclusion is to limit the scope of the risk of such insurance, so as to avoid the greater financial risk arising from accidents involving larger watercraft. Though the operation of a tug alone might not entail such risks, the risks of financial loss from a maritime accident clearly increased when the tug and barge were joined and operated together.

Thus, our reading of these contested terms comports with the likely intent of the policy.

For all these reasons, we conclude that MCMC's operation of the barge fits within the watercraft exclusion of the policy.

### B. Can American recover under the theory that the Seawind II was responsible for the loss?

American argues that even if the barge is excluded, the fact that the tug is not excluded means that some recovery should be had for any and all damages that were caused by operation of the tugboat. But this argument misreads the language of the exclusion. The exclusion provides that insurance does not apply to bodily injury or property damage caused by an occurrence arising from the operation of a watercraft. It is true that the exclusion does not apply to certain watercraft, including the Seawind II. American argues that this exception to the exclusion means that "all property damage arising out of . . . the use and operation of the *Seawind II* is covered by the Policy." This is plainly illogical. Simply because accidents arising from the use of the Seawind II are not excluded does not mean that any accident involving the Seawind II is automatically covered. Rather, if such an accident also arose from the use of the DS64, it would not be covered.

The question we must ask then is whether the wreck arose out of the operation of the DS64. In evaluating this question, the district court concluded, "[i]n operating the tugboat Mr. Splettstoesser operated the barge as well and this incident would

-15-

not have occurred but for the presence of the barge and the peril created by Mr. Splettstoesser's attempt to convey it down the channel into the Merrimack River." First Specialty, 532 F. Supp. 2d at 197. Though American argues that this is an improper test of causation in this circumstance, we see it instead as a conclusion that the accident arose out of the joint operation of the Seawind II and the DS64. For the reasons stated above, we agree with this conclusion. The record shows that Splettstoesser navigated the tug with concern for its effect on the barge, that he lost control of the barge, and that both vessels were then grounded. Thus, American is not entitled to recover for damages to the Seawind II, the DS64, or the cleanup costs, as all of these arose from the accidental occurrence involving the operation of the DS64.

American attempts to avoid this conclusion by encouraging us to apply the efficient proximate cause doctrine. "The efficient proximate cause rule operates to permit coverage when an insured peril sets other excluded perils into motion which 'in an unbroken sequence and connection between the act and final loss, produce the result for which recovery is sought.'" Kish v. Ins. Co. of N. Am., 883 P.2d 308, 311 (Wash. 1994) (quoting Graham v. Pub. Employees Mut. Ins. Co., 656 P.2d 1077, 1081 (Wash. 1983)). "In such a situation, the insured peril is considered the 'proximate cause' of the entire loss and the loss is covered despite the fact that the other perils contributing to the loss were excluded." Id.

-16-

(footnote omitted); see also Fajardo Shopping Ctr., S.E. v. Sun Alliance Ins. Co., 167 F.3d 1, 7-8 (1st Cir. 1999).

Under this doctrine, American argues that the operation of the tugboat was, as a matter of law, the efficient proximate cause of the occurrence, or, in the alternative, that a jury should be permitted to so find. American further contends that the district court erred by (1) analyzing "but for" causation rather than proximate causation and (2) effectively concluding that the barge was the sole cause of the accident. We disagree.

First, it is not clear that Maine courts apply this doctrine or that the doctrine is even applicable to the kind of general liability insurance at issue. But we need not decide these questions of law since we agree with the district court's conclusion that application of the doctrine would not save American. The efficient proximate cause doctrine is only applicable where the causes are independent. Tento Int'l, Inc. v. State Farm Fire & Cas. Co., 222 F.3d 660, 662 n.2 (9th Cir. 2000)("For the efficient proximate cause theory to apply, . . . there must be two separate or distinct perils which 'could each, under some circumstances, have occurred independently of the other and caused damage.'" (quoting Pieper v. Commercial Underwriters Ins. Co., 69 Cal. Rptr. 2d 551, 557 (Cal. Ct. App. 1997))); Kish, 883 P.2d at 311. Here, the undisputed facts show that Splettstoesser was operating the tug and barge together,

maneuvering the tug in such a way as to achieve the desired effect on the barge.  There is no way in which his operation of the tug and his operation of the barge could be thought of as independent causes of the accident.  Cf. Terra Res., 695 F.2d at 831 (finding for the insured owners of a barge where a defective mooring caused damage, concluding that the damage would still have occurred independent of the fact that the insured owned the barge).  The district court's conclusion that the accident would not have occurred "but for" the presence of the barge is just another way of stating this conclusion.  Thus, though the efficient proximate cause doctrine might be applicable in other circumstances, it does not apply on these facts.  Nor is there a question for the jury. If some independent cause, say a lightning strike to the tugboat, had caused damage, the jury might be called on to parse which cause was primarily responsible for the occurrence.  But here, the record indisputably shows that the joint operation of the tug and barge led to the wreck, which caused all damages for which American now seeks to recover.

### III.  Conclusion

For the foregoing reasons, the summary judgment entered in favor of First Specialty against American is affirmed.

**Affirmed**.