Rule 23 order filed
April 19, 2019.
Motion to publish granted
May 2, 2019.

2019 IL App (5th) 180248

NO. 5-18-0248

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Massac County. |
| | ) | |
| v. | ) | No. 16-CF-20 |
| | ) | |
| JAMES R. LAMBERT, | ) | Honorable |
| | ) | Joseph M. Leberman, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE OVERSTREET delivered the judgment of the court, with opinion.
Justices Welch and Moore concurred in the judgment and opinion.

**OPINION**

¶ 1    In November 2014, the defendant, James R. Lambert, was involved in an automobile collision on the Brookport Bridge, which spans the Ohio River between Massac County, Illinois, and McCracken County, Kentucky. The defendant was initially charged in McCracken County with offenses stemming from the incident, but the charges were later dismissed on the grounds that the accident had actually occurred in Illinois. After the defendant was subsequently charged with similar offenses in Massac County, he filed a motion to suppress evidence that had been obtained by the McCracken County sheriff's department. Following a hearing, the circuit court entered an order partially granting the defendant's motion to suppress. The State appeals, and for the reasons that follow, we reverse that portion of the circuit court's judgment.

1

¶ 2                                          FACTS

¶ 3      In *Illinois v. Kentucky*, 500 U.S. 380, 389-90 (1991), after declaring that the boundary between the Commonwealth of Kentucky and the State of Illinois was the low-water mark along the Ohio River's northern shore as it existed in 1792, the United States Supreme Court remanded the case "to the Special Master for such further proceedings as may be necessary to prepare and submit an appropriate decree for adoption by the Court, locating the 1792 line." In December 1994, after such proceedings were held, the Special Master filed a report with the Court advising that the United States Geological Survey had used 7355 geodetic coordinate points to identify the 1792 low-water mark as nearly as it could presently be determined and had prepared maps identifying a proposed boundary line based on those coordinates. *Illinois v. Kentucky*, Report of Special Master, Original No. 106 (1994) 6-9. The report identified the maps as "Joint Exhibit Numbers 3-24" and the coordinate points as "Joint Exhibit Numbers 25 and 26." *Id.* at 8. The report advised that the exhibits accurately reflected the 1792 low-water mark as nearly as it could now be determined and recommended that the Court adopt the exhibits as declarative of the boundary line between Kentucky and Illinois. *Id.* at 13-14. The Special Master's proposed decree stated that the boundary line between Kentucky and Illinois "is fixed as geodetically described in Joint Exhibits 3 through 26." *Id.* at 18. Notably, the decree further stated that Kentucky and Illinois "each have concurrent jurisdiction over the Ohio River." *Id.* at 19. The decree ordered that copies of the decree and copies and prints of Joint Exhibits 3 through 26 be filed with the Secretary of State of Illinois, the Secretary of State of Kentucky, and the county clerk's offices of the Kentucky and Illinois counties along the Ohio River, including Massac and McCracken. *Id.* In January 1995, the Court adopted the Special Master's report and entered the proposed decree. *Illinois v. Kentucky*, 513 U.S. 177 (1995).

¶ 4    In February 2016, a Massac County grand jury indicted the defendant on two counts of aggravated driving under the influence of alcohol (625 ILCS 5/11-501(d)(1)(A), (C) (West 2014)), one count of obstructing justice (720 ILCS 5/31-4(a)(1) (West 2014)), one count of unlawful possession of cannabis (720 ILCS 550/4(b) (West 2014)), and one count of unlawful possession of drug paraphernalia (720 ILCS 600/3.5(a) (West 2014)). In March 2017, the defendant filed his motion to suppress. In December 2017, the cause proceeded to a hearing on the motion, where the following evidence was adduced.

¶ 5    On the afternoon of November 11, 2014, Deputy Jerry Jones and Sergeant David Shepherd of the McCracken County sheriff's department were dispatched to the Brookport Bridge to respond to a reported head-on collision involving a pickup truck and a car. Officers Nick Myrick and Chris Hines of the Brookport, Illinois, police department also responded to the reported collision and assisted the Kentucky officers. Jones and Shepherd were the only witnesses called at the suppression hearing, but the parties stipulated that Myrick would have testified that he and Hines were the first officers to arrive at the scene of the accident.

¶ 6    It was undisputed that the Brookport Bridge is approximately a mile long and that the defendant's accident occurred on the Illinois side of the bridge along a curve "over dry land in Illinois." It was also noted that the curve where the accident occurred was a "bad location" that had been the scene of numerous prior collisions. The record indicates that the defendant is a resident of Kentucky and has prior convictions for driving under the influence of alcohol.

¶ 7    Jones testified that when he arrived at the scene of the accident, he saw the defendant and his female passenger, Katrina Warren, standing by the truck that had been involved in the crash. Jones then observed the defendant throw something off the bridge. Jones asked Myrick and Hines to look under the bridge, and on the dry land below, they discovered a small bag of marijuana, a pipe with

3

marijuana residue, and a pack of rolling papers. Jones took possession of the items and later booked them into evidence.

¶ 8 Jones testified that the car that had collided with the truck sustained "quite a bit of damage" and that its female occupant had to be removed from the vehicle so that she could be transported by ambulance to a local hospital. The record indicates that the ambulance had been dispatched from Kentucky. Jones indicated that Warren had sustained minor injuries and was also taken to a hospital for medical treatment. After the scene of the accident was "cleared," Jones spoke with Warren at the hospital, and she advised him that the defendant had been driving the truck at the time of the collision. Jones testified that Warren also had an observable "seat belt burn" that was consistent with a passenger injury.

¶ 9 Shepherd testified that when he had spoken with the defendant on the bridge, the defendant exhibited slurred speech and was unsteady on his feet. There was also an odor of alcoholic beverage about the defendant's person, and his eyes were red and glassy. Apparently, the defendant claimed that he had not been driving. Shepherd arrested the defendant for possessing the contraband recovered from under the bridge and transported him to the McCracken County jail. Before leaving Illinois, Shepherd read the defendant his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)) and questioned him about the contraband.

¶ 10 At the McCracken County jail, after Shepherd was advised that Warren had identified the defendant as the driver of the truck, Shepherd cited him for driving under the influence of alcohol and administered a horizontal gaze nystagmus test. Shepherd testified that the defendant had refused to submit to further field sobriety tests and had also refused to submit to chemical testing of his blood, breath, or urine.

4

¶ 11    It was undisputed that all of the law enforcement officers who responded to the collision on the Brookport Bridge believed that the accident had occurred within Kentucky's jurisdiction. Jones testified that prior to "this case," there had been "an agreement with Illinois to where Kentucky would police every bit of the bridge[,] and Illinois would conduct maintenance on every bit of the bridge." Jones indicated that the agreement as to the policing of the entire bridge had been abandoned after the Kentucky charges against the defendant had been dismissed. Jones acknowledged that he had "never seen a written agreement" and had only been advised of the agreement's existence. The agreement had nevertheless provided "the assumptions" that the officers had previously "operated upon." Jones testified that the Kentucky charges against the defendant had been dismissed on jurisdictional grounds based on "the case law" regarding "the low[-]water mark" of the Ohio River. Jones indicated that there were now signs on the bridge "delineating where that mark is."

¶ 12    Shepherd testified that he had worked for the McCracken County sheriff's department for 21 years and that "up until this case," the curve in the bridge had historically been considered Kentucky's jurisdiction. Shepherd explained that he had personally "worked numerous collisions in that curve," but the McCracken County sheriff's department did not work them anymore.

¶ 13    Following the hearing on the defendant's motion to suppress, the parties submitted memorandums in support of their respective positions regarding the evidence that had been obtained by the Kentucky officers. Referencing sections 107-3 and 107-4 of Code of Criminal Procedure of 1963 (725 ILCS 5/107-3, 107-4 (West 2014)), the defendant emphasized that the present case did not involve a "fresh pursuit" situation and that the Kentucky officers had exercised authority that "went well beyond the authority that a private citizen would have in making a citizen[']s arrest." The defendant argued that "[a]ll of the actions of the Kentucky officers were improper, if not illegal."

5

¶ 14    In response, the State maintained, among other things, that even assuming that the defendant's extraterritorial arrest had resulted in a violation of his constitutional rights, suppression of the evidence obtained by the Kentucky officers was not warranted under the "good faith" principles generally recognized in *People v. LeFlore*, 2015 IL 116799. The State asserted that all of the officers who had responded to the defendant's accident had acted with a good-faith belief that the accident had occurred in Kentucky. The State also noted that signs designating the Illinois-Kentucky border had since been erected on the Brookport Bridge.

¶ 15    In March 2018, the circuit court entered a written order finding that all of the officers who had responded to the defendant's accident had "believed that the Kentucky officers had jurisdiction of any incident that occurred on the Brookport Bridge," which "was a mistake of fact." The court found that because of that mistake of fact, the Kentucky officers had taken charge of the accident scene. The court determined that the Kentucky officers' authority to make an arrest in Illinois was the limited authority afforded a private citizen pursuant to section 107-3. See *People v. Lahr*, 147 Ill. 2d 379 (1992). The court concluded that a private citizen could have arrested and questioned him with respect to the contraband he had thrown from the bridge but could not have subsequently detained and questioned him at the McCracken County jail. The court therefore granted the defendant's motion to suppress with respect to the evidence, "including the officer's observations," obtained at the jail and denied the motion with respect to the cannabis, the drug paraphernalia, and the questioning and observations that had occurred in Illinois. The court did not address the State's argument that the suppression of the evidence was not warranted because the officers had acted in good faith. In April 2018, the State filed a certificate of substantial impairment and a timely notice of appeal pursuant to Illinois Supreme Court Rule 604(a)(1) (eff. July 1, 2017).

¶ 17     At the outset, we note that the State does not challenge the circuit court's finding that the Kentucky officers exceeded the statutory authority that they had under the circumstances. The State also concedes for the sake of its argument on appeal that the defendant's extraterritorial arrest violated the fourth amendment and that the exclusionary rule applies. But see *People v. Fitzpatrick*, 2013 IL 113449, ¶ 20 n.1; *United States v. Ryan*, 731 F.3d 66, 70-71 (1st Cir. 2013) (and cases cited therein); *State v. Morris*, 92 A.3d 920, 928-29 (R.I. 2014); *Delker v. State*, 50 So.3d 300, 302-05 (Miss. 2010). The State's sole assertion is that by rejecting its contention that "the present case falls squarely under the good-faith exception to the exclusionary rule," the circuit court erred in suppressing the evidence that was obtained while the defendant was incarcerated in the McCracken County jail. In response, primarily relying on our supreme court's decision in *People v. Carrera*, 203 Ill. 2d 1 (2002), the defendant argues that the circuit court's judgment should be affirmed because the good-faith exception is inapplicable. We agree with the State.

¶ 18     On appeal from a circuit court's granting of a motion to suppress evidence, the court's findings of fact are given great deference and will only be reversed if they are against the manifest weight of the evidence. *People v. Bonilla*, 2018 IL 122484, ¶ 8. The circuit court's legal ruling on whether the evidence should be suppressed, however, is reviewed *de novo*. *Id.* "[W]here, as here, there is no factual or credibility dispute, and the question involves only the application of the law to the undisputed facts, our standard of review is *de novo*." *People v. Butorac*, 2013 IL App (2d) 110953, ¶ 14.

¶ 19     "The fourth amendment of the United States Constitution, applicable to the states through the due process clause of the fourteenth amendment, guarantees to all citizens the right to be free from unreasonable searches and seizures." *In re Lakisha M.*, 227 Ill. 2d 259, 264 (2008). A "seizure"

occurs when an individual's freedom of movement is restrained by physical force or a show of authority (*United States v. Mendenhall*, 446 U.S. 544, 553 (1980)), and "[f]or purposes of the fourth amendment, a seizure is an arrest" (*People v. Lopez*, 229 Ill. 2d 322, 346 (2008)).

¶ 20    Article I, section 6, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 6) contains a search-and-seizure clause similar to the fourth amendment's, which is interpreted "in 'limited lockstep' with its federal counterpart." *LeFlore*, 2015 IL 116799, ¶ 16. Under the limited-lockstep doctrine, the decisions of the United States Supreme Court will be followed unless doing so would conflict with Illinois's longstanding history and traditions or drastically change Illinois's constitutional law. See *Fitzpatrick*, 2013 IL 113449, ¶¶ 15-21. We note that Kentucky employs a similar doctrine (see *Commonwealth v. Cooper*, 899 S.W.2d 75, 77-78 (Ky. 1995)) and has consistently interpreted its search-and-seizure clause "in congruence with" the fourth amendment (*Parker v. Commonwealth*, 440 S.W.3d 381, 387 (Ky. 2014)).

¶ 21    To deter unlawful police conduct and thereby effectuate the fourth amendment's guarantee against unreasonable searches and seizures, the United States Supreme Court created the exclusionary rule. *Arizona v. Evans*, 514 U.S. 1, 10 (1995). Notably, "the abuses that gave rise to the exclusionary rule featured intentional conduct that was patently unconstitutional." *Herring v. United States*, 555 U.S. 135, 143 (2009). Where applicable, the exclusionary rule precludes the admission of evidence obtained in violation of the fourth amendment. *People v. Sutherland*, 223 Ill. 2d 187, 227 (2006).

¶ 22    "The fruit-of-the-poisonous-tree doctrine is an outgrowth of the exclusionary rule providing that 'the fourth amendment violation is deemed the "poisonous tree," and any evidence obtained by exploiting that violation is subject to suppression as the "fruit" of that poisonous tree.' " *People v. Burns*, 2016 IL 118973, ¶ 47 (quoting *People v. Henderson*, 2013 IL 114040, ¶ 33). However,

8

" '[t]he mere fact of a fourth amendment violation does not mean that exclusion necessarily follows' because there 'is no constitutional right to have the evidence resulting from an illegal search or seizure suppressed at trial.' " *Id.* ¶ 51 (quoting *LeFlore*, 2015 IL 116799, ¶ 22). "Instead, application of the exclusionary rule has been restricted to those 'unusual cases' where it can achieve its sole objective: to deter future fourth amendment violations." *LeFlore*, 2015 IL 116799, ¶ 22 (quoting *United States v. Leon*, 468 U.S. 897, 918 (1984)).

¶ 23     Importantly, because the suppression of evidence will often work to suppress the truth and effectively pardon the commission of a criminal offense, application of the exclusionary rule requires that the deterrent benefit of suppressing the evidence outweigh the substantial social costs. See *Davis v. United States*, 564 U.S. 229, 237 (2011). Because the exclusionary rule focuses on "the 'flagrancy of the police misconduct' at issue," it should not be applied reflexively. *Id.* at 238 (quoting *Leon*, 468 U.S. at 911). "Exclusion of evidence is a court's last resort, not its first impulse," and "when there is no illicit conduct to deter, the deterrent rationale loses much of its force." *Burns*, 2016 IL 118973, ¶¶ 51-52. "Real deterrent value" is a " 'necessary condition for exclusion' " (*Davis*, 564 U.S. at 237 (quoting *Hudson v. Michigan*, 547 U.S. 586, 596 (2006)), and the United States Supreme Court has "repeatedly rejected efforts to expand the focus of the exclusionary rule beyond deterrence of culpable police conduct" (*id.* at 246). "Thus, exclusion is invoked only where police conduct is both 'sufficiently deliberate' that deterrence is effective and 'sufficiently culpable' that deterrence outweighs the cost of suppression." *LeFlore*, 2015 IL 116799, ¶ 24 (quoting *Herring*, 555 U.S. at 144). Accordingly, "even when a fourth amendment violation has occurred, the evidence that resulted will not be suppressed when the good-faith exception to the exclusionary rule applies." *Id.* ¶ 17.

9

¶ 24　The good-faith exception to the exclusionary rule is a judicially created rule providing that evidence obtained in violation of a defendant's fourth amendment rights will not be suppressed when the police acted with an objectively reasonable good-faith belief that their conduct was lawful or when their conduct involved only simple, isolated negligence. *Bonilla*, 2018 IL 122484, ¶ 35; *LeFlore*, 2015 IL 116799, ¶ 24. When determining whether the good-faith exception to the exclusionary rule is applicable, a court must consider whether a reasonably well-trained officer would have known that his conduct was illegal in light of all of the circumstances. *LeFlore*, 2015 IL 116799, ¶ 25. A reasonably well-trained officer is expected to know what is required under the fourth amendment. See *Davis*, 564 U.S. at 241.

¶ 25　The good-faith exception to the exclusionary rule recognizes that the purpose of the exclusionary rule is not served where the evidence sought to be suppressed was obtained as a result of "nonculpable, innocent police conduct." *Id.* at 240. The good-faith exception thus applies where the police act in reliance on the legal landscape that existed at the time, so long as it was objectively reasonable to do so and a reasonable officer would not have suspected that his conduct was wrongful under the circumstances. *LeFlore*, 2015 IL 116799, ¶ 31. Moreover, the fourth amendment itself will tolerate a seizure arising from an officer's mistake of fact, so long as the mistake was a reasonable one to make. *Heien v. North Carolina*, 574 U.S. ___, ___, 135 S. Ct. 530, 536 (2014).

¶ 26　The good-faith exception to the exclusionary rule also recognizes that police officers should not be penalized for errors made by other officials upon whom they must rely to execute their duties and responsibilities. See *Davis*, 564 U.S. at 240-41. The United States Supreme Court has thus found that the good-faith exception is applicable where an officer reasonably relies on a search warrant later deemed invalid, on binding judicial precedent upholding a statute later deemed unconstitutional, or on erroneous arrest-warrant information obtained from a database maintained by

judicial or police employees. *Id.* at 238-40. Application of the good-faith exception is not, however, limited to the specific circumstances addressed in the decisions rendered by the United States Supreme Court. *LeFlore*, 2015 IL 116799, ¶ 29.

¶ 27    In *People v. Carrera*, 203 Ill. 2d 1, 11 (2002), a majority of our supreme court held that "Illinois law is settled that the exclusionary rule is applicable where the police effectuate an extraterritorial arrest without appropriate statutory authority." The defendant cites this holding as supportive of the circuit court's judgment in the present case. As the State observes, however, as the supreme court later explained in *People v. Holmes*, 2017 IL 120407, the *Carrera* majority specifically declined to consider whether the good-faith exception to the exclusionary ruled applied, because *Carrera* involved a statute enacted in violation of the single-subject clause of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8(d)), which implicated the void *ab initio* doctrine. *Holmes*, 2017 IL 120407, ¶¶ 19-20. Thus, "the majority resolved the case by applying the void *ab initio* doctrine and declined to address the good-faith exception due to its belief that application of the good-faith exception would be counter to the void *ab initio* doctrine." *Id.* ¶ 20. Because the void *ab initio* doctrine is not implicated in the present case, *Carrera* did not preclude the circuit court's application of the good-faith exception. We therefore reject the defendant's suggestion that the circuit court was right to ignore the State's argument that the officers who responded to his accident had acted with a good-faith belief that the accident had occurred in Kentucky's jurisdiction.

¶ 28    Turning to the merits of the State's claim, as previously indicated, although Myrick and Hines were the first officers to arrive at the scene of the defendant's accident, they did not assume control of the situation. Instead, they assisted Jones and Shepherd, who did assume control. Jones testified that prior to "this case," there had been an agreement between Illinois and Kentucky providing that "Kentucky would police every bit of the bridge[,] and Illinois would conduct

11

maintenance on every bit of the bridge." Shepherd testified that he had worked for the McCracken County sheriff's department for 21 years and that "up until this case," the curve in the bridge where the defendant's accident occurred had historically been considered Kentucky's jurisdiction. Shepherd further indicated that the McCracken County sheriff's department had been dispatched to the Illinois side of the bridge to work "numerous collisions in that curve" while the agreement was in effect. Jones explained that after the McCracken County charges against the defendant had been dismissed, signs had been placed on the bridge delineating the boundary between Kentucky and Illinois, and the agreement had been terminated.

¶ 29    Although it is not clear whether the agreement was formal or informal, it appears that prior to this case, the agreement had amicably governed the jurisdiction of the Brookport Bridge for at least 21 years without ever being questioned or challenged. Because the agreement represented the relevant legal landscape that existed at the time, all of the officers who responded to the defendant's accident believed that Kentucky had jurisdiction over any incident that occurred on the bridge. Mistaken or not, that belief was objectively reasonable, because prior to this case, Kentucky had been exercising such jurisdiction. Furthermore, while the agreement was in effect, there were no signs on the bridge marking the territorial boundary line between Kentucky and Illinois.

¶ 30    Under the circumstances, all of the officers who responded to the defendant's accident acted with an objectively reasonable good-faith belief that their conduct was lawful, and by merely responding to the accident and working it as they had always worked accidents on the bridge, none would have suspected otherwise. They also acted as well-trained officers would be expected to act; the officers from Kentucky who were dispatched to handle the accident responded and took charge, and the Brookport officers who responded to assist had generously assisted. The officers did not deliberately violate the defendant's rights and only later learned that he had been subject to an

12

extraterritorial arrest. A reasonably well-trained officer would not have believed that his or her conduct was improper under the circumstances.

¶ 31    On appeal, the defendant intimates that because *Illinois v. Kentucky* was decided nearly 30 years ago, a reasonably well-trained officer should have known that because Kentucky's northern border did not extend past the Ohio River's low-water mark as it was in 1792, the curve in the Brookport Bridge was Illinois territory. The defendant relatedly argues that the present case demonstrates recurring negligence on the part of the police. We disagree. Not only do the defendant's claims suggest that the responding officers had a duty to determine whether *Illinois v. Kentucky* affected the validity of the longstanding agreement regarding the policing of the bridge, it presumes that *Illinois v. Kentucky* worked to immediately dissolve the agreement.

¶ 32    Although it is axiomatic that a reasonably well-trained officer would be expected to know the boundaries of the areas that he or she is ordered to police, the officer does not establish those boundaries and does not have the authority to do so. Police officers are "entitled to rely on traditional sources for the factual information on which they decide and act" (*Scheuer v. Rhodes*, 416 U.S. 232, 246 (1974)), which would necessarily include boundary markers and signs. Police officers are further entitled to rely on information received from their dispatchers (*United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001)) and instructions received from their supervisors, "particularly where those instructions [are] not inconsistent with their personal knowledge and experience" (*Washington Square Post No. 1212 American Legion v. Maduro*, 907 F.2d 1288, 1293 (2d Cir. 1990)). Police officers are not expected to be "legal technicians" (*In re Marsh*, 40 Ill. 2d 53, 56 (1968)), however, and a reasonably well-trained officer is not responsible for anticipating or resolving legal matters that are beyond his or her purview (see *United States v. Workman*, 863 F.3d 1313, 1320-21 (10th Cir. 2017); *United States v. Diaz*, 841 F.2d 1, 6 (1st Cir. 1988)).

13

¶ 33    Here, it was not the responding officers' responsibility to determine whether *Illinois v. Kentucky* might have changed the legal landscape that had been governed by agreement, nor was it their responsibility to locate and mark the Illinois-Kentucky boundary line on the Brookport Bridge. See 605 ILCS 5/2-202, 4-201.12 (West 2014); 625 ILCS 5/11-301, 11-303 (West 2014); Ky. Rev. Stat. Ann. §§ 189.010(3), 189.231, 189.337 (West 2014). Moreover, pursuant to the Supreme Court's decree, the maps and coordinates that might have assisted an officer's attempt to locate the boundary line were presented to the governmental authorities who were specifically named in the decree. It was seemingly incumbent on those authorities to anticipate any jurisdictional issues that might have arisen in the immediate wake of the Court's decision and to resolve, as they apparently did here, those that might later arise. As the State suggests, however, not only did the Court's decision not work to immediately dissolve the longstanding agreement regarding the policing of the Brookport Bridge, given that the Court's decree gave Kentucky and Illinois concurrent jurisdiction over the Ohio River, the decree might have been viewed as facially validating the agreement. But see *Bedell v. Commonwealth*, 870 S.W.2d 779, 781 (Ky. 1993) ("Commission of a statutory offense in Kentucky gives rise to the authority of the courts of this state to preside over the prosecution of the case."). We also note that even assuming that the Kentucky officers who responded to the defendant's accident had reason to question their informed belief that they had jurisdiction over the entire bridge, when they were dispatched to the bridge to handle the defendant's accident, they had no choice but to comply. "A police officer does not have the prerogative of actively disobeying an order from a superior while seeking a determination as to the validity of that order." *Martin v. Matthys*, 149 Ill. App. 3d 800, 808 (1986). "Such a practice would thwart the authority and respect which is the foundation of the effective and efficient operation of a police force." *Id.*; see also *Johnson v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 114 Ill. 2d 518, 522 (1986)

14

(noting that "unlike an ordinary citizen, the policeman has *no* option as to whether to respond" (emphasis in original)).

¶ 34    Ultimately, despite the fact that the Court's decree in *Illinois v. Kentucky* was entered in 1995, it is not surprising that the agreement was not dissolved and that the signs delineating the boundary between Illinois and Kentucky were not posted until after the defendant was successful in having the McCracken County charges against him dismissed in the present case. While it may take years or even decades to emerge, such a challenge will certainly give notice of the need for such changes. See, *e.g.*, *Benham v. State*, 637 N.E.2d 133, 137 (In. 1994) (holding that although Indiana and Kentucky each have concurrent jurisdiction over the Ohio River as confirmed in *Kentucky v. Indiana*, 474 U.S. 1 (1985), Indiana's jurisdiction over criminal offenses is limited to its "actual territorial boundaries"); *City of Cincinnati v. Dryden*, 91 Ohio Misc. 2d 235, 238 (Hamilton Co. 1998) (holding that although Ohio and Kentucky each have concurrent jurisdiction over the Ohio River pursuant to *Ohio v. Kentucky*, 410 U.S. 641 (1973), Ohio's jurisdiction over criminal offenses occurring on the bridges spanning the river is limited to "those activities [that] occur north of the boundary line declared by the Supreme Court"). To the extent that those changes could have or should have occurred prior to this case, however, is not something assignable to officers who responded to the defendant's accident.

¶ 35    Lastly, because there are now signs on the Brookport Bridge marking the boundary line between Illinois and Kentucky and because the McCracken County sheriff's department no longer polices the Illinois side of the bridge, it is unlikely that an extraterritorial arrest like the defendant's will reoccur. As previously noted, "[r]eal deterrent value" is a " 'necessary condition for exclusion' " (*Davis*, 564 U.S. at 237 (quoting *Hudson*, 547 U.S. at 596)), and the "sole objective" of the exclusionary rule is "to deter future fourth amendment violations" (*LeFlore*, 2015 IL 116799, ¶ 22).

15

Here, excluding the evidence in question would not serve that objective and would only punish the cooperative police work of the officers who acted with an objectively good-faith belief that the defendant's accident had occurred in Kentucky's jurisdiction. The exclusionary rule "simply cannot be applied to a situation where it offers little or no deterrent benefit and where there is not the least bit of culpability that can be charged to the officer's conduct." *LeFlore*, 2015 IL 116799, ¶ 51.

¶ 36    As noted, when partially granting the defendant's motion to suppress, the circuit court found that all of the officers who had responded to the scene of the accident had mistakenly believed that Kentucky had jurisdiction over any incident that occurred on the Brookport Bridge. The court did not consider, however, whether the responding officers had acted with an objectively reasonable good-faith belief that their conduct was lawful, whether the officers' mistake of fact was reasonable, whether a reasonably well-trained officer would have known that his conduct was illegal in light of all of the circumstances, or whether excluding the evidence at issue had any deterrent value. Because the exclusion of evidence is a court's "last resort" (*Burns*, 2016 IL 118973, ¶ 51), we conclude that the court should not have ignored the State's good-faith argument and should have denied the defendant's motion to suppress in its entirety. We accordingly reverse the portion of the court's judgment that granted the motion with respect to the evidence obtained at the McCracken County jail. The court's judgment is otherwise affirmed, and the cause is remanded for further proceedings not inconsistent with this decision.

¶ 37    Affirmed in part and reversed in part; cause remanded.

16

2019 IL App (5th) 180248

NO. 5-18-0248

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

THE PEOPLE OF THE STATE OF ILLINOIS,    )    Appeal from the
    )    Circuit Court of
    Plaintiff-Appellant,    )    Massac County.
    )
v.    )    No. 16-CF-20
    )
JAMES R. LAMBERT,    )    Honorable
    )    Joseph M. Leberman,
    Defendant-Appellee.    )    Judge, presiding.

_____

**Rule 23 Order Filed:**    April 19, 2019
**Motion to Publish Granted:**    May 2, 2019
**Opinion Filed:**    May 2, 2019

_____

**Justices:**    Honorable David K. Overstreet, P.J.

    Honorable Thomas M. Welch, J., and
    Honorable James R. Moore, J.,
    Concur

_____

**Attorneys**
**for**
**Appellant**    Hon. Patrick Windhorst, Massac County State's Attorney, Massac County Courthouse, 101 West 8th Street, Metropolis, IL 62960; Patrick Delfino, Director, Patrick D. Daly, Deputy Director, Sharon Shanahan, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, 730 East Illinois Highway 15, Suite 2, Mt. Vernon, IL 62864

_____

**Attorneys**
**for**
**Appellee**    Mark C. Hunter, Cord Z. Wittig, Kruger, Henry & Hunter, 110 W. 5th Street, P.O. Box 568, Metropolis, IL 62960

_____